**MEDICAL MALPRACTICE JOINT UNDERWRITING ASSOCIATION OF RHODE ISLAND**

v.

**RHODE ISLAND INSURERS' INSOLVENCY FUND et al.**

**No. 96–103—Appeal.**

Supreme Court of Rhode Island.

Dec. 17, 1997.

Thomas R. Bender, David P. Whitman, Providence, for Plaintiff.

Joseph C. Tanski, Boston, MA, Dennis S. Baluch, John W. Kershaw, Howard E. Walker, Alan R. Tate, William H. Jestings, Elizabeth A. Kelleher, Providence, Joseph C. Marrow, Boston, MA, for Defendants.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on the appeal of the Rhode Island Insurers' Insolvency Fund (fund or RIIIF) from a declaratory judgment entered in the Superior Court pursuant to a complaint filed by the Medical Malpractice Joint Underwriting Association of Rhode Island (JUA). This complaint sought a declaration of the responsibilities of the fund to participate in settlement negotiations in conjunction with other insurers of joint tortfeasors in attempting to resolve litigation involving a number of defendants who could potentially be held partially liable for the injuries upon which a plaintiff's complaint might be based. At the time this complaint for declaratory judgment was filed, there were approximately forty medical-malpractice actions in which one defendant was insured by the fund as a result of the insolvency of the original insurer for that defendant. In these suits one or more other defendants were insured and defended by JUA. From these forty pending actions, JUA selected two cases as illustrative of the problems created when the fund declined to participate in settlement negotiations and declined to contribute toward such settlements unless and until the medical-malpractice plaintiff had exhausted the insurance coverage of all other defendants (joint tortfeasors) who were covered by other carriers, including JUA. The cases selected involved the following factual circumstances.

In September 1994 Rhoda Brenner (Brenner) brought a medical-malpractice action against Thomas King, M.D. (Dr. King), as well as an action against his employer, Miriam Hospital (Miriam), and Herbert Rakatansky, M.D. (Dr. Rakatansky), under respondeat superior and negligent diagnosis theories, respectively. In 1993, the period during which the alleged malpractice occurred, Dr. King was insured by Premier Alliance Insurance Company (Premier), and Dr. Rakatansky and Miriam were insured under separate polices issued by JUA. Miriam's policy covered the hospital, as well as its agents, servants, and employees, with the exception of physician employees. By the time Brenner filed suit in September 1994, Premier was insolvent. The fund took the place of Premier as required by the Rhode Island Insurers' Insolvency Fund Act (the act), General Laws 1956 chapter 34 of title 27. The applicable provision of § 27–34–8(a)(2), (4) specifically mandates that the fund will

> "[b]e deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties and obligations of the insolvent insurer as if

the insurer had not become insolvent; [and] * * * [i]nvestigate claims brought against the fund and adjust, compromise, settle, and pay covered claims to the extent of the fund's obligation and deny all other claims."

In February 1995 Brenner demanded from all tortfeasors a total of $30,000 to settle her claims. The plaintiff requested the fund's cooperation and contribution toward settlement. The fund acknowledged that it was apparent that Dr. King may have erred in failing to render an adequate diagnosis. However, the fund asserted that it was unable to enter into negotiations or to offer settlement because it was obliged to withhold any payment pending exhaustion of the insurance limits of all other tortfeasors. Further, since the fund believed that plaintiff's insureds would not make it through trial without an assignment of at least a small portion of liability, Brenner had the obligation to exhaust the coverage of JUA's insureds before seeking to recover from the fund.

The JUA responded, asserting that there was no question that Dr. King was the principal culpable party and that the value of Brenner's claim would dramatically increase to the wrongful death statutory minimum of $100,000 with Brenner's anticipated demise in the near future. The fund still refused to participate in settlement negotiations. The plaintiff, believing Brenner's claim would significantly increase upon her death, settled the claims against all tortfeasors. The fund contends that JUA is statutorily barred from seeking contribution from the fund pursuant to § 27–34–5(8)(ii)(C).

Another pending case was brought by Joseph R. Beaudette (Beaudette) against Miriam Hospital, Salim Ghorra, M.D. (Dr. Ghorra), and A. Gerson Greenburg, M.D. (Dr. Greenburg). In that case JUA insured Miriam as well as its agents and employees, excepting employee physicians. Rhode Island Sound Enterprises Insurance Co., Ltd., insured Dr. Ghorra, and Premier insured Dr. Greenburg. The basis for the claim was an allegedly negligent appendectomy performed by Doctors Greenburg and Ghorra on Beaudette at Miriam. In both the Brenner and Beaudette situations the fund refused to consider contributing to any settlement on behalf of its insured until both the JUA policy coverage and the Rhode Island Sound Enterprises Insurance Co., Ltd., coverage were first exhausted.

In response to this posture JUA sought a declaratory judgment in the following terms:

"Declaring that RIIIF is required, under the Insolvency Fund Act, § 27–34–1, et seq. of the General Laws of Rhode Island (1956), as amended, to defend Greenburg in the Beaudette case in the same manner as a solvent insurer up to the applicable contractual or statutory limit of liability, whichever is less and subject only to first party type offsets set forth in § 27–34–12, and to adjust and/or defend medical malpractice claims against all other former Premier (now RIIIF) insureds in the same manner; and

"Declaring that RIIIF execute its responsibilities under the Insolvency Fund Act without requiring Beaudette to exhaust the medical malpractice liability insurance coverage available to Miriam and/or Ghorra before making payment, if warranted, on Beaudette's claim, or requiring any other claimant to exhaust the medical malpractice liability insurance coverage available to all potential tortfeasors as to such claimant before making payment on any other such claim, if warranted."

Both parties moved for summary judgment and provided an agreed statement of facts. Primarily at issue was the interpretation of § 27–34–12, entitled "Nonduplication of recovery" which provides in pertinent part:

"(a) Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his or her right under that policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under the insurance policy.

"(b) Any person having a claim or legal right of recovery under any governmental insurance or guaranty program which is also a covered claim, shall be required to

exhaust first his or her right under that program. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under the program."

The trial justice observed:

"I think that the statute, § 27–34–12, when read with the definitions, and read in harmony with these other statutes, leads to the conclusion, at least my conclusion, that the policies that the claimant must exhaust are the claimant's own policies, not the policies of putative co-defendants or joint tortfeasors. So that the claimant confronting the insolvent insurer and hence the insolvency fund, must look to any contractual rights he or she can exercise, such as in an uninsured motorist policy. It would seem that if the legislature wanted to have the joint tortfeasor's liability fully explored and, indeed, adjudicated in some situations prior to the insolvency fund coming into the fray, so to speak, it would have said so but it did not."

The trial justice entered judgment consistent with the declaration sought by JUA. The judgment requires the fund to defend and pay claims against those persons insured by the insolvent Premier in the same manner as would a solvent insurer, without first requiring the medical-malpractice plaintiff to exhaust the liability coverage available to codefendants. From this judgment the fund filed a timely appeal.

In support of its appeal the fund raises several issues that can be combined into a single argument, namely, that § 27–34–12 requires exhaustion of all other available insurance policies and governmental insurance before the fund may be required to participate in settlement negotiations and/or contributions toward settlement, even though its insured may have a substantial potential for liability under the malpractice plaintiff's claim. Further facts will be supplied in order to deal with this issue.

Section 27–34–12 quoted above provides in pertinent part as follows:

"(a) Any person *having a claim against an insurer under any provision in an insurance policy* other than a policy of an insolvent insurer which is also a covered claim, *shall be required to exhaust first his or her right under that policy.* Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under the insurance policy." (Emphases added.)

The trial justice construed this provision to require a medical-malpractice plaintiff to exhaust only his or her first-party coverage and not the third-party claims that such a plaintiff might have against other codefendants insured by solvent companies. With this determination we agree.

This court recognized in *Martin v. Lincoln Bar, Inc.,* 622 A.2d 464, 465 (R.I.1993), that § 27–34–12 requires a plaintiff to proceed against his or her own insurance carrier prior to seeking compensation from the fund. On this issue there is no dispute. Moreover, JUA is not disputing the right of the fund to set off recoveries from either first-party insurers or third-party insurers against any liability that might ultimately be determined in respect to the fund's insureds. The sole issue is whether the malpractice plaintiff is required to exhaust potential third-party-liability coverage available to codefendants who may be liable to that plaintiff. We are of the opinion that such exhaustion is not required.

The fund is a nonprofit corporate entity established by the Rhode Island Insurers' Insolvency Fund Act, chapter 34 of title 27. The fund is supported by assessments upon liability-insurance carriers that do business within the state. Its purpose as set forth in § 27–34–2 is to provide a mechanism for the payment of covered claims under certain insurance policies "to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, and to create an entity to assess the cost of the protection and distribute it equitably among member insurers."

The fund is obliged to assume all the obligations that would have been incumbent upon the insolvent insurer had it not become unable to discharge these responsibilities. Section 27–34–8(a)(1)(2). We have held that it is the duty of an insurer under Rhode Island law to act in good faith with respect to claims brought by and against policyholders.

*Rumford Property and Liability Insurance Co. v. Carbone,* 590 A.2d 398, 400 (R.I.1991). We have also held that an insurer must act in a reasonable manner and in good faith in settling third-party claims against its insured. *Bibeault v. Hanover Insurance Co.,* 417 A.2d 313, 318 (R.I.1980). The liability of the fund is capped at $300,000, § 27–34–8(a)(1)(iii), but otherwise it is required to act in all respects as though it were a solvent insurer in respect to protecting the interests of its insured. Even though the fund, its agents, its employees, and its board of directors are immune from action taken by them in the performance of their duties, § 27–34–16, the requirement to exercise good faith is nevertheless statutorily commanded. Section 27–34–8(a)(4) directs the fund to "[i]nvestigate claims brought against [it] and adjust, compromise, settle, and pay covered claims to the extent of the fund's obligation."

The fund cites a number of cases purportedly concerning the exhaustion requirement. *See, e.g., Zhou v. Jennifer Mall Restaurant, Inc.,* 699 A.2d 348 (D.C.App.1997); *Costello v. American Universal Insurance Co.,* 633 A.2d 260 (R.I.1993); *Ventulett v. Maine Insurance Guaranty Association,* 583 A.2d 1022 (Me.1990). These cases all dealt with the setoff provision that was included in the nonduplication-of-recovery provision, not the exhaustion requirement. We clearly held in *Costello* that one who recovered money must set such sums off against any recovery that was due from the fund. In that case by a brief order we held that § 27–34–12 had a plain and unambiguous meaning and that any amount payable from the fund must be reduced by any recovery under any other insurance policy. *Costello,* 633 A.2d at 260. Although not challenging these holdings, JUA continues to assert that they have nothing to do with the exhaustion requirement. The only case that dealt with such a requirement was *Oglesby v. Liberty Mutual Insurance Co.,* 832 P.2d 834 (Okla.1992). In that case an exhaustion requirement under Louisiana law was applied to a claimant who had a direct claim against the defendant's liability carrier. Such is not the case in respect to a third-party claim under Rhode Island law.

The only case cited by counsel that dealt with a similar exhaustion requirement was *Sands v. Pennsylvania Insurance Guaranty Association,* 283 Pa.Super. 217, 423 A.2d 1224 (1980). In that case the plaintiff, James E. Sands (Sands), was a passenger in a vehicle driven by Arthur Davis (Davis) when it collided with another vehicle driven by an uninsured motorist. Sands had his own uninsured-motorist coverage with Granite Mutual Insurance Co. (Granite). Among other claims Sands sought recovery against Granite and obtained a verdict for $10,000. Thereafter Granite became insolvent, and Sands sought payment from the Pennsylvania Insurance Guaranty Association (Pennsylvania Guaranty). Pennsylvania Guaranty refused to pay Sands's claim because he had not brought action against the driver, Davis, who was one of the alleged tortfeasors and had not exhausted Davis's liability coverage under the policy issued by Hawkeye Security Insurance Company (Hawkeye). *Id.* 423 A.2d at 1225. The Pennsylvania court, interpreting a statute nearly identical to our § 27–34–12, held that Sands did not have an obligation to exhaust Davis's coverage with Hawkeye because Sands did not have a claim against Davis's insurer. *Id.* 423 A.2d at 1227.

Similarly Rhode Island has held that a third-party claimant does not have a direct claim against the insurer of a tortfeasor. *See, e.g., Cianci v. Nationwide Insurance Co.,* 659 A.2d 662, 666 (R.I.1995), and *Auclair v. Nationwide Mutual Insurance Co.,* 505 A.2d 431 (R.I.1986). These cases hold that a claimant and an insurance carrier for a third party deal with one another in an adversary relationship. The injured person is "a stranger to the relationship between the insurer and the insured." *Cianci,* 659 A.2d at 667. There is no direct right of action by a claimant against an insurance company until the claim has been reduced to judgment against the tortfeasor. G.L. 1956 § 27–7–2. In respect to JUA the same condition would apply. There would be no right of action by a medical-malpractice plaintiff against JUA until judgment has been entered against its insured after trial or by written agreement of settlement.

We are of the opinion that the trial justice's construction of § 27–34–12 is not only most reasonable but also consistent with the object of the statute and the public policy that underlies it. The posture adopted by the fund would delay settlements and guarantee litigation. As indicated in the Brenner scenario, the fund would stand aloof from any settlement discussions or participation until a medical-malpractice plaintiff brought suit against and exhausted the coverage of a codefendant even if that codefendant was responsible for only a minor percentage of the liability against that plaintiff. The fund would then rely upon the statutory exemption that prohibits it from making payment of any amount due to an insurer or underwriting association by subrogation or otherwise. Section 27–34–5(8). In short it would then resist any claim for contribution on behalf of the codefendant who might be only 1 percent liable for the plaintiff's injuries.

However, when the fund participates in settlement negotiations with a plaintiff and makes a payment on behalf of its insured to a plaintiff or a claimant, it is not paying an amount due to an insurer but is making a payment directly to a plaintiff. The posture taken by the fund also ignores its obligation to its insured who has come under its protection by the insolvency of the original insurer. The statute clearly imposes upon the fund the duty to protect the interests of its insured in the same manner as would be required of a solvent insurer. It has been held unequivocally that an insurer has a duty to act in the best interests of its insured in order to protect the insured from excess liability. *See Allstate Insurance Co. v. Campbell,* 334 Md. 381, 639 A.2d 652, 656–57 (1994). As suggested in that case an insurer must refrain from acts that demonstrate greater concern for the insurer's monetary interest than the financial risk attendant to the insured's situation. The fund, by standing aloof from participation in settlement, might protect itself from suits for contribution, but it would not protect its insured from suits for contribution. It would thereby subject its insured to the possibility of significant excess liability by refusing to participate at an early stage of litigation or in adjustment of a claim when that participation would be effective.

Taking into account the entire purpose of the statute that created the fund and the policy that motivated its adoption, we are of the opinion that the trial justice was correct in entering the declaratory judgment requiring the fund to participate in defending its insured and to adjust and/or to defend medical-malpractice claims against other former Premier insureds in the same manner as would a solvent insurer, without requiring the claimant to exhaust the medical-malpractice liability insurance available through the other codefendants.

For the reasons stated, the fund's appeal is denied and dismissed. The declaratory judgment entered in the Superior Court is affirmed. The papers in the case may be remanded to the Superior Court.