423 A.2d 1224

**James E. SANDS**

v.

**PENNSYLVANIA INSURANCE GUARANTY ASSOCIATION, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 10, 1979.

Filed Dec. 19, 1980.

Petition for Allowance of Appeal Denied May 29, 1981.

218

James McCabe, Philadelphia, for appellant.

Maurice M. Green, Philadelphia, for appellee.

Before SPAETH, HESTER and CAVANAUGH, JJ.

SPAETH, Judge:

This is an appeal from a judgment entered in an action in assumpsit against the Pennsylvania Insurance Guaranty Association. The issues are of first impression and require interpretation of the non-duplication of recovery provisions of the Pennsylvania Insurance Guaranty Association Act, Act of Nov. 25, 1970, P.L. 716, No. 232, Art. I § 101 *et seq.*, 40 P.S. § 1701.101 *et seq.*

On June 7, 1968, an automobile driven by Arthur Davis was involved in a collision with an automobile driven by J. H. Patton. The collision occurred at an intersection in Philadelphia. James Sands was a passenger in the Davis automobile and was badly hurt in the collision, incurring damages of at least $26,671.78.

Davis had liability and uninsured motorist coverage in the amount of $10,000 with Hawkeye Security Insurance Co.

Patton was uninsured. Sands had uninsured motorist coverage in the amount of $10,000 with Granite Mutual Insurance Co. Sands did not bring an action in trespass against either Davis or Patton. He did, however, make the following three claims.

First, Sands claimed, and received, reimbursement of his hospital expenses from the Associated Hospital Service of Philadelphia in the amount of $6,671.28.

Second, Sands made a claim against Hawkeye under Davis's uninsured motorist coverage; he was entitled to make this claim because Davis's policy with Hawkeye provided protection against damages suffered in a collision with an uninsured motorist not only to Davis himself but also to his passenger. Hawkeye paid Sands $10,000—the full amount of the uninsured motorist coverage—in consideration of Sands executing a release of all claims against Hawkeye.

Finally, Sands made a claim against Granite under his own uninsured motorist coverage. When Granite refused to pay this claim, Sands sued Granite and recovered a verdict of $10,000. On Granite's appeal, we affirmed. *Sands v. Granite Mutual Ins. Co.*, 232 Pa.Super. 70, 331 A.2d 711 (1974).

In the meantime, Granite had been declared insolvent. Sands applied to the Pennsylvania Insurance Guaranty Association for payment of the amount of his verdict against Granite—$10,000—with interest from January 23, 1973, which was the date on which the verdict was returned. When the Guaranty Association refused payment, Sands brought the present action against the Association. A panel of arbitrators entered an award in favor of Sands in the amount of $9,900 (under the Pennsylvania Guaranty Association Act, the Association is not obliged to pay the first $100 of any claim, 40 P.S. § 1701.201(b)(1)(i)). The Association appealed, and after a trial without a jury, the lower court entered a verdict for Sands in the amount of $9,900 with interest from December 26, 1975, which was the date on which Sands filed his amended complaint against the Association. The Association filed exceptions, and when these were dismissed, it filed this appeal.

On appeal, the Association argues that it need not pay Sands because he has failed to exhaust insurance coverage available to him with a solvent insurer, namely, Hawkeye, and also because he has already recovered from the Associated Hospital Service and Hawkeye amounts that together exceed his claim against the Association. The Association also argues that if Sands is entitled to a recovery, it cannot be required to pay any interest on that recovery.

I

During the last two decades a series of studies conducted by legislatures, scholars, and industry associations revealed the serious social harm that results from insurance companies becoming insolvent. *See e. g., Hearings on S.Res. 40 Before the Subcomm. on Antitrust and Monopoly of the State Comm. on the Judiciary,* 89th Cong., 1st Sess. pt. 12 (1965); *Hearings on S.Res. 40 Before the Subcomm. on Antitrust and Monopoly of the Senate Comm. on the Judiciary,* 91st Cong., 1st Sess. pt. 15 (1969); D. Olson, Insolvencies Among Automobile Insurers: Advisory Report to the Division of Industry Analysis, Bureau of Economics, Federal Trade Commission for the Department of Transportation (1970); 1 *Proceedings of the National Association of Insurance Commissioners* 52 (1963). In response, the National Association of Insurance Commissioners drafted the "State Post-Assessment Insurance Guaranty Association Model Bill." *See* Official N.A.I.C. Model Insurance Laws, Regulations and Guidelines, V. II. at 540–1 *et seq.* As of March 1978, forty states had adopted an insurance guaranty act that was substantially similar to the N.A.I.C. Model Bill. *See* Model Bill, supplement. The Pennsylvania Guaranty Association Act, *supra,* 40 P.S. § 1701.101 *et seq.,* is the Pennsylvania version of the Model Bill.

By virtue of the Act, the Pennsylvania Guaranty Association comprises every property and casualty insurance carrier in this state; their membership is a condition of their authority to write insurance policies within the State. 40 P.S. § 1701.201(a). The purposes of the Act are:

(1) To provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims, and to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer;

(2) To assist in the detection and prevention of insurer insolvencies; and

(3) To provide for the formulation and administration by The Pennsylvania Insurance Guaranty Association of a plan of operation necessary to effectuate the provisions of this act.

40 P.S. § 1701.102 (Purdon 1971).

The Act provides that the Association shall, among its other obligations,

(i) Be obligated to make payment to the extent of the covered claims of an insolvent insurer existing prior to the determination of said insurer's insolvency, and covered claims arising within thirty days after the determination of insolvency, or before the policy expiration date if less than thirty days after such determination, or before the insured replaces the policy or causes its cancellation, if he does so within thirty days of such determination; but such obligation shall include only that amount of each covered claim which is in excess of one hundred dollars ($100), and is less than three hundred thousand dollars ($300,000). In no event shall the association be obligated on a covered claim in an amount in excess of the obligation of the insolvent insurer under the policy under which the claim arises.

(ii) Be deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if that insurer had not become insolvent.

40 P.S. § 1701.201(b)(1)(i).

The Act also provides, under the heading "Non-duplication of recovery," that

Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an

insolvent insurer which is also a covered claim, shall first be required to exhaust his right under such policy. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under such insurance policy.

40 P.S. § 1701.503(a).

## II

### –A–

■ The Guaranty Association's first argument is that it need not pay Sands because he has failed to exhaust insurance coverage available to him with a solvent insurer, namely, Hawkeye. In its Summary of Argument, the Association says:

> In the present case, [Sands] had a claim of $20,000 against Hawkeye . . . , $10,000.00 under the uninsured motorist coverage in that policy and $10,000.00 under the liability coverage. Nevertheless, [Sands] settled with Hawkeye for $10,000.00 and now seeks to recover $10,-000.00 from [the Association]. Since he settled with Hawkeye for less than the full amount of his potential claim against that solvent insurance carrier, he has neither asserted nor exhausted his "claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer." [40 P.S. § 1701.503(a)]

Appellant's Brief at 9–10.

We are not persuaded by this argument.

Quoted in full, the statutory provision upon which the Association's argument depends provides: "Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall first be required to exhaust his rights under such policy." Sands was indeed "[a] person having a claim against [Hawkeye as a solvent insurer]," *so far as* Hawkeye provided uninsured motorist coverage. However, Hawkeye paid that claim to the limit—$10,000—of its policy. Accordingly, Sands *did* "exhaust his rights under such policy [Hawkeye's policy]."

But, says the Association, Sands *also* "had a claim of . . . $10,000.00 under the liability coverage [of Hawkeye's policy]." Appellant's Brief at 9. The premise of this assertion is that

> [s]ince this is an intersectional collision and [Sands] was a passenger in one of the vehicles, . . . the probability of negligence of both drivers . . . is sufficiently great to raise a presumption that there is coverage available through the liability provisions of Davis' policy [with Hawkeye] to the extent of the $10,000.00 limits of that coverage. Appellant's Brief at 14.

However, nothing in the record justifies a finding of "the probability of negligence of both drivers." We do not know how the collision occurred. Perhaps both drivers, Davis—Hawkeye's insured—and Patton—who was not insured—, were negligent; but it is just as easy to suppose that only Patton was, in which event Sands was *not* "[a] person having a claim" through the liability provisions of Davis's policy with Hawkeye. Furthermore, even if Davis was negligent, the most that could then be said would be that Sands was "[a] person having a claim against" *Davis* ; he would not be a person having a claim against Davis's "insurer," Hawkeye. And finally, even if Sands did have a claim against Davis, and that claim is regarded as a claim against Hawkeye, still, Sands was not required to exhaust the claim unless it was "also a covered claim," 40 P.S. § 1701.503(a), and it was not, because a "covered claim"

> means an unpaid claim, including a claim for unearned premiums, *which arises under a property and casualty insurance policy of an insolvent insurer* . . . .
> 40 P.S. § 1701.103(5)(a) (emphasis added).

A "claim against an insurer" would "also be a covered claim" only if that claim was for an "unpaid claim" arising under an insurance policy of an "insolvent insurer." Any claim Sands might have had against Hawkeye under a liability policy could not have also been a covered claim because it would not be a claim for an unpaid claim resulting from the insolvency of an insurer but from the negligence of Davis.

–B–

■ The Guaranty Association's second argument may be stated as follows: The Association notes that the "covered claim" by Sands against Granite was $9,900 ($10,000 for uninsured motorist coverage less the $100 deductible amount provided for by the Guaranty Association Act). It also notes that Sands has recovered $16,671.78 from "solvent insurers": $6,671.78 from Associated Hospital Service, and $10,000 from Hawkeye. It then states:

Since $9,900.00, the "amount payable on a covered claim under this Act" is less than $16,671.78, "the amount of any recovery" under "an insurance policy other than a policy of an insolvent insurer," the second sentence of § 503(a) prevents recovery [by Sands of his claim against the Association], and he must look to the Statutory Liquidator of Granite for his recovery.

Appellant's Brief at 10.

We are not persuaded by this argument either.

The second sentence of § 503(a) provides:

Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under such insurance policy.

40 P.S. § 1701.503(a).

The phrase "any recovery under such insurance policy" refers back to any recovery on a claim of the sort identified in the first sentence of § 503(a). That sentence provides:

Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall first be required to exhaust his right under such policy.

However, Sands did not make any recovery on a claim within this sentence. He did not have, and did not make any recovery on, a claim against Hawkeye for liability coverage. He did have a claim against Hawkeye for uninsured motorist coverage, and he did make a recovery on that claim, but it was not "also a covered claim" because it did not result from Granite's insolvency.

The way the second sentence of § 503(a) works may be seen by reference to *Lucas v. Illinois Insurance Guaranty Fund,* 52 Ill.App.3d 237, 10 Ill.Dec. 81, 367 N.E.2d 469 (1977), and *Prutzman v. Armstrong,* 90 Wash.2d 118, 579 P.2d 359 (1978).

In *Lucas v. Illinois Insurance Guaranty Fund, supra,* Lucas recovered a judgment against an insured tortfeasor for $390,000. The limit of the tortfeasor's liability insurance policy was $20,000, and prior to trial, the tortfeasor's liability insurer, LaSalle National Insurance Company, became insolvent. Lucas was then able to recover $10,000 under her own uninsured motorist policy, which provided protection in the event her tortfeasor's insurer became insolvent. Lucas then attempted to recover $19,900 from the Illinois Insurance Guaranty Fund—the full amount of her tortfeasor's liability insurance ($20,000) minus the applicable Guaranty Fund deductible ($100). 52 Ill.App.3d at 238, 10 Ill.Dec. at 82, 367 N.E.2d at 470. The Fund argued that she had to reduce this $19,900 by $10,000—the amount she had recovered under her own uninsured motorist policy. 52 Ill.App.3d at 238, 10 Ill.Dec. at 82, 367 N.E.2d at 470. Lucas replied by arguing that the recovery under her own uninsured motorist policy was from a collateral source. 52 Ill.App.3d at 238, 10 Ill.Dec. at 82, 367 N.E.2d at 470. The court rejected this argument, reasoning that any relief provided by the Fund was by reason of a statute enacted to protect both insured and claimant from the unexpected loss that results when an insurance company becomes insolvent. *Id.* Since Lucas would only have been able to receive a total of $20,000 had LaSalle not become insolvent, the court reasoned, it would be an unfair windfall to allow her to receive $29,900 ($19,900 from the Fund and $10,000 uninsured motorist coverage under her own policy) simply because LaSalle became insolvent. Said the court:

There is no inconsistency between the "non-duplication" provisions and the purpose of the Act. The statutory purpose is to place claimants in the same position that they would have been in if the liability insurer had not

become insolvent. (Ill.Rev.Stat.1975, ch. 73, par. 1065.82.) The Act states that the Fund is intended to protect claimants against financial loss because of the insolvency of insurance companies. The difference between the amount of the insolvent insurer's policy limits and the amount paid to claimant by his own insurer is made up by the Fund. To permit a greater recovery than would have occurred had the insurance company remained solvent would both extend the Act beyond its purpose and offend public policy by giving the Act an interpretation which results in a windfall judgment.

52 Ill.App.3d at 239, 10 Ill.Dec. at 83, 367 N.E.2d at 471.

Similarly, in *Prutzman v. Armstrong, supra*, Prutzman's uninsured motorist coverage was equal to the coverage provided by the tortfeasor's liability insurance policy. In rejecting her claim against the Washington Insurance Guaranty Association, the Washington Supreme Court reasoned that she could "not receive greater insurance recovery than she could have received if [her tortfeasor's insurer] had not suffered bankruptcy." 90 Wash.2d at 122, 579 P.2d at 362. *See also, King v. Jordan*, 601 P.2d 273 (Alaska 1979).

The present case presents a different problem. Sands would not be any better off if the Guaranty Association paid his uninsured motorist claim against Granite than he would have been if Granite had not become insolvent. Indeed, because of the deductible amount required under the Act, he would be $100 worse off.

—C—

The Guaranty Association's last argument is that if Sands is entitled to any recovery from the Association—and we have held above that he is—"the clear language of the Act prohibits any award of interest." Appellant's Brief at 10.

The general rule is that a plaintiff is entitled to interest on a judgment from the date of the verdict. 42 Pa.Cons.Stat. § 8101 (corresponds to 12 P.S. § 781—repealed and reenacted by Act of April 28, 1978 P.L. 202, No. 53

§ 2(a)[360]). Thus, had Granite not become insolvent, Sands would have been entitled to interest from January 23, 1973. The Guaranty Association, however, is not the legal successor of Granite; it is obligated to pay claims "only to the extent of . . . covered claims." 40 P.S. § 1701.201(b)(1)(i). A "covered claim shall not include any amount in excess of the applicable limits of the policy under which it arises." 40 P.S. § 1701.103(5)(b). We therefore agree with the Association to this extent: When Sands applied to the Association, because Granite had become insolvent, the Association was not obligated to pay him any interest on the verdict he had recovered against Granite; its obligation was to pay $9,900 —$10,000, as the limit of Granite's policy, less $100.

In fact, however, the Association refused to pay Sands.

The Act provides that the Association may "sue or be sued." 40 P.S. § 1701.201(b)(2)(iii). Sands did sue the Association, and recovered a judgment, which we are going to affirm insofar as it required the Association to pay Sands $9,900. Ordinarily, a judgment for the payment of money bears interest from "the date of the verdict or award." 42 Pa.Cons.Stat. § 8101. We find no other statutory provision or other reason that excludes the Association from this rule. We therefore conclude that the Association is liable to pay interest on the $9,900 that it should have paid, but refused to pay, Sands, and for which Sands recovered judgment against the Association. According to the docket entries in the record, the lower court returned its verdict for Sands "in the amount of $9,900 plus interest" on October 27, 1978. Interest should therefore be calculated as accruing from that date.

The case is remanded to the lower court with instructions to calculate interest on the $9,900 verdict against Pennsylvania Insurance Guaranty Association as of October 27, 1978. Either party may file another appeal from this calculation. In all other respects, the Order of the lower court is affirmed.