# Blackwell v. Pennsylvania Insurance Guaranty Association

*Edward Silva*, for plaintiff.
*Michael O'Hayer*, for defendant.

BALDWIN, *J.*, April 24, 1989 — The facts in this case are not in dispute. On March 7, 1985, plaintiff was a passenger in an automobile operated by Blanche Grebloski. The Grebloski vehicle was struck by a tractor-trailer owned by Ferree Transport and operated by Lee Gilbert. As a result of the collision plaintiff was seriously injured.

Ferree and Gilbert were insured by Carriers Insurance Company with $6,000,000 in liability coverage. While plaintiff's suit for damages was pending, Carriers was adjudicated insolvent. Plaintiff then claimed under the uninsured-motorist coverage on both her policy with Allstate and the Grebloski policy with State Farm, receiving $40,000 from State Farm and $25,000 from Allstate. Plaintiff has now made claim with defendant under the Pennsylvania Insurance Guaranty Association Act, 40 P.S. §1701.101 et seq.

Defendant concedes a duty to pay plaintiff but asserts the right to reduce her claim by the $65,000 in uninsured-morotist coverage already received by plaintiff. Plaintiff initiated a declaratory-judgment action seeking interpretation of the statute, and cross motions for summary judgment are currently before the court for disposition.

The Pennsylvania Insurance Guaranty Association Act, *supra,* is the Pennsylvania version of a model bill drafted by the National Association of Insurance Commissioners to address the social harm resulting from insurance companies becoming insolvent. Defendant, Pennsylvania Insurance Guaranty Association, is entirely a creature of statute created by section 201 of the act. It is funded through assessments levied against every property and casualty insurer as a condition of writing such insurance within the commonwealth. The legislature, in section 102 of the act, has stated its purpose for enacting the bill, which inter alia includes:

"(1) To provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims, and to avoid financial loss to claimants or policy holders as the result of the insolvency of an insurer . . . "

Section 103 defines a "covered claim" as an unpaid claim arising under the property and casualty insurance policy of an insolvent insurer.

Since plaintiff's claim arises due to the insolvency of Carriers, it clearly constitutes a covered claim under the act. Defendant's duties with respect to such claims are set forth in section 201(b)(1)(i) which provides that the association shall:

"Be obligated to make payment to the extent of the covered claim of an insolvent insurer . . . but such obligation shall include only that amount of

each covered claim which is in excess of $100, and is less than $300,000. In no event shall the association be obligated on a covered claim in an amount in excess of the obligation of the insolvent insurer under the policy under which the claim arises."

In support of its asserted reduction of payments by the amount of uninsured-motorist benefits, defendant cites section 502(a), entitled "non-duplication of recovery," which reads as follows:

"Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall first be required to exhaust his right under such policy. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under such insurance policy."

A claim on an uninsured-motorist policy arising because of the insolvency of a tort-feasor's insurer is a covered claim which must be exhausted by the claimant before making a claim for payment under the act. *Henninger v. Riley,* 317 Pa. Super. 570, 464 A.2d 469 (1983). Both parties agree that section 503(a) requires the reduction of plaintiff's uninsured-motorist benefits from her claim, but they disagree over the manner in which the legislature intended those benefits to be deducted. Although most states have adopted an insurance guaranty act substantially similar to the model bill upon which Pennsylvania legislation is based, the parties and the court have been unable through their research to uncover any prior judicial consideration of the specific issues involved in this case.

Plaintiff argues that the *Henninger* decision distinguishes between a "covered claim" under the act and defendant's "obligation" to make payment. Since the tort-feasor's insurer provided liability coverage in the amount of $6,000,000 prior to its

insolvency, the full amount of plaintiff's claim for her injuries, stipulated to be at least $365,000, constitutes a covered claim under the act. In the absence of the uninsured motorist coverage available to her, plaintiff would be able to collect only $299,900 of that claim from defendant, since section 201(b)(1)(i) limits defendant's obligation to $300,000 less a $100 deductible. Plaintiff argues that section 503(a) requires the $65,000 uninsured motorist coverage be reduced from her claim before determining the extent of the defendant's "obligation" under section 201. Since the value of her claim would still be at least $300,000 after reducing the uninsured motorist coverage, she argues that defendant is obligated to make the maximum statutory payment to her in the amount of $299,900. She maintains that such an interpretation of section 503(a) is appropriate in light of the stated purpose for the act "to avoid financial loss to claimants . . . as a result of the insolvency of an insurer" as expressed in section 102(1) of the act.

In *Sands v. Pennsylvania Insurance Guaranty Association,* 283 Pa. Super. 217, 423 A.2d 1224 (1980), the court determined that section 503(a) did not preclude plaintiff's claim against PIGA because the insurance recovery made by plaintiff did not constitute a covered claim under the act; and section 503 requires only the reduction of covered claims from PIGA's obligation.

Although non-essential to the issue before the court in *Sands,* in an effort to clarify the manner in which the second sentence of section 503(a) works, the court quoted from the decision in *Lucas v. Illinois Insurance Guaranty Fund,* 52 Ill. App. 3d. 237, 10 Ill. Dec. 81, 367 N.E.2d 469 (1977), for the proposition that there is no inconsistency between the non-duplication provision of section 503 and the

act's purposes as stated in section 102. The *Lucas* court had held that the statutory purpose was to place claimants in the same position in which they would have had the liability insurer not become insolvent. That court further concluded the purpose was to protect claimants against financial loss because of the insolvency of insurance companies and that the guaranty fund was to make up the difference between the amount of the insolvent insurer's policy limits and the amount paid to the claimant by his own insurer. In this case plaintiff argues that the policy limits of the insolvent insurer were $6,000,000. If the tort-feasor's insurer had not become insolvent, the plaintiff would have been able to collect the full $365,000 value of her claim for injuries. She argues that it is, therefore, consistent with the purpose of the fund to reduce the uninsured-motorist benefits she has received from her claim, and not from the defendant's obligation under the act.

In *Lucas* the plaintiff had recovered a judgment against an insured tort-feasor for $390,000. The tort-feasor's liability insurance policy had a limit of $20,000 and the liability insurer became insolvent prior to trial. The plaintiff recovered $10,000 under her own uninsured motorist policy because of the insolvency of the tort-feasor's insurer and sought to recover $19,900 from the guaranty fund, representing the full amount of the tortfeasor's liability coverage less the $100 deductible. As in the instant case, the plaintiff in *Lucas* sought to deduct the uninsured motorist proceeds from the value of her claim, rather than from the guaranty fund's obligation under the act. The court agreed with the guaranty fund that the uninsured motorist coverage should be reduced from the fund's obligation to the plaintiff to avoid a windfall recovery for the plaintiff. The court reasoned that

had the tort-feasor's liability insurer remained solvent, the plaintiff would have only collected the $20,000 limit of that policy and, therefore, should not be able to collect an additional $10,000 because the insurer became insolvent.

Based upon the language in *Lucas, Sands,* and *Henninger,* plaintiff urges us to interpret the second sentence of section 503(a) to require the reduction of plaintiff's uninsured motorist coverage from the guaranty fund's statutory obligation only if failure to make such a reduction would result in a windfall to the claimant. We believe it is beyond the purview of this court, under the guise of interpreting legislative intent, to graft such a limitation on the specific language of the act. To do so would require us to disregard and rewrite the language adopted by the legislature.

The second sentence of section 503(a) requires that an amount "payable on a covered claim under this act" be reduced by the amount of the uninsured motorist coverage collected by the claimant. Since "covered claim" is a term of art defined in section 103 and, therefore, requires no further modification or definition, the phrase "under this act" as used in this section relates to amounts that are "payable . . . under the act." Where, as in this case, the limits of the tort-feasor's liability insurance equal or exceed the amount of plaintiff's claim for injuries, the entire claim of plaintiff is a "covered claim" under the act; but the claim is only made payable by defendant pursuant to the provisions of section 201(b)(1)(i), which specifically limits defendant's obligation to that part of the covered claim which is in excess of $100 and less than $300,000.

In section 201(b)(1)(ii) the act provides that the association shall "[b]e deemed the insurer to the extent of its obligation on the covered claims . . . " It appears that in the event of an insolvency, the

legislature intended to replace the policy of the insolvent insurer up to a limit of $300,000, less the deductible. That limit then becomes the maximum which the claimant may recover from the association, and from this maximum, by virtue of section 503(a), must be deducted any uninsured motorist proceeds recovered by the claimant as a result of the insolvency of the tortfeasor's insurer.

We believe that plaintiff has misread *Henninger* when she asserts that the uninsured motorist coverage must be deducted from the covered claim before determining the obligation of defendant. On the contrary, the court in *Henninger* listed three steps that must occur before the association stands in place of the insolvent insurer: (1) a determination as to whether or not the claim is a "covered claim" under the act, (2) a determination of the extent of the association's obligation under section 201 of the act, and (3) the requirement that the claimant exhaust his rights against his own insurance coverage (uninsured motorist coverage). It is clear that the exhaustion of uninsured motorist coverage and the reduction of that amount from defendant's obligation is the last step in the procedure, and not the first as plaintiff urges in this case.

Accordingly, we enter the following

## ORDER OF COURT

And now, April 24, 1989, upon consideration of defendant's motion for summary judgment, plaintiff's answer thereto, plaintiff's cross motion for summary judgment, the briefs of the parties and oral argument thereon, it is hereby ordered:

(1) Defendant's motion for summary judgment is granted;

(2) Plaintiff's cross-motion for summary judgment is denied.