**Baker v. Myers**

304

*Jeffrey S. Kahn,* for plaintiff.
*Daniel F. Ryan III,* for defendants.

DiNUBILE, *J.,* February 9, 1999—The issue presented in post-trial motions in this case is whether or not the plaintiff can obtain recovery from the defendant himself, who was insured and defended by the Pennsylvania Property and Casualty Insurance Guaranty Association (PIGA), where the sums paid to the plaintiff by other insurance companies arising from the claim in question exceeded the amount of the verdict and

delay damages. Although plaintiff seems to concede that PIGA would not be liable under these circumstances, his counsel asserts, however, that satisfaction can be obtained directly from the insured defendant. After a review of the Pennsylvania Property and Casualty Insurance Guaranty Act and the relevant case law, this court reaches the conclusion that since PIGA is not obligated to pay, due to certain setoffs as provided for under the statute, then the plaintiff also is precluded from obtaining recovery directly from the insured defendant himself. As a result of this ruling, the verdict and judgment were molded to reflect a zero award.

The facts can be stated briefly as follows. The plaintiff, Robert Baker, sued the defendants, Donald L. Myers M.D. (neurosurgeon), and Sanford Davne M.D. (orthopedic surgeon), under the theories of negligence and lack of informed consent arising from a spinal fusion surgery in which pedicle screws and plates were used in the performance of the operation. This matter was one of a number of mass tort bone screw cases administered and tried at the Complex Litigation Center in Philadelphia by the court. The jury absolved both physicians of malpractice but found liability on the part of defendant, Dr. Myers, as to lack of informed consent. A verdict was returned in plaintiff's favor against Dr. Myers in the amount of $47,500.[1]

Defendant, Dr. Myers, was insured originally by the Physicians' Insurance Company (PIC). This company went insolvent and was placed in liquidation by court order on January 21, 1998. As a result of this event, PIGA assumed the defense of Dr. Myers. Trial com-

---

1. The court had ruled that Dr. Myers was the only physician who was involved in obtaining the informed consent and not Dr. Davne. Therefore, the verdict based on informed consent was entered solely against Dr. Myers.

menced on November 13, 1998. The jury rendered its verdict on November 18, 1998. A petition for delay damages subsequently was filed and this court awarded an additional $18,162.91, resulting in the total judgment entered against the defendant to be raised to $65,662.91. It is without question that the insurance recoveries by the plaintiff in this case, which involved workers' compensation benefits as well as medical costs for several subsequent surgeries, far exceeded the amount of the judgment which was entered by this court.[2] PIGA exists under the Pennsylvania Property and Casualty Insurance Guaranty Act (the PIGA statute), 40 P.S. §991.1801 et seq. The statute clearly provides under 40 P.S. §991.1817(a) that PIGA is entitled to a reduction on any amount it is obligated to pay the plaintiff (in this case from the judgment in question) by the amount of "any kind of insurance" which the plaintiff recovered under the claim. Since it is without dispute that plaintiff received insurance benefits both under workers' compensation and for certain surgeries which far exceeded the amount of the judgment entered in this case, PIGA is absolved from any obligation to pay the judgment sum of $65,662.91.

Plaintiff seems not to dispute this fact but asserts that the Act does not bar his right to recover directly from the defendant. Such a broad interpretation of the Act would operate to defeat the purpose of the PIGA statute. It was enacted to protect good faith policyholders of insolvent companies who, without PIGA, could suffer financial loss defending and paying claims against them which otherwise would have been covered had their insurer not become bankrupt. While it is true that the

2. Plaintiff, in his argument, asserts that any offset must be limited to those medical bills which were submitted to the jury. A reading of the Act indicates the contrary.

legislature also created PIGA to protect claimants of insolvent insurers who would have had no other source of insurance from which to recover their losses, this aspect of the purpose of the Act does not form the basis to support plaintiff's assertion for recovery directly against the defendant insured. The statute strikes a reasonable balance of affording insurance protection for policyholders of insolvent insurers while allowing an opportunity for claimants of these insureds to obtain some recovery. The Act clearly limits recovery in instances where the plaintiff claimant had been compensated by "any kind of insurance." It would defeat the purpose of the Act to permit PIGA a setoff, but at the same time open up its insured to liability for this amount. Therefore, if PIGA is absolved from payment, clearly the insurer is as well. Consequently, the judgment of verdict was molded to reflect a zero award. In arriving at this decision, the court has followed the well-reasoned opinion of its colleague, the Honorable Mark I. Bernstein, who, in *Panea v. Isdaner,* Court of Common Pleas Civil Trial Division, November term 1995, no. 1564 (1/9/99), held, after an in-depth analysis of the Act, that PIGA was entitled to offsets for sums of money from insurance paid to the plaintiff arising from the claim. Thus, a $75,000 settlement was reduced by $25,000 which represented the amount of the setoff. This court also adopts the opinion of the Honorable Thomas A. Swope Jr. of the Court of Common Pleas of Cambria County, in *Gallaher v. Wetzel,* civil action—law, no. 1996-2143 (12/4/98), who also held that any offsets entitled to PIGA could not be recovered directly from the defendant insured. Copies of these opinions are attached and made a part hereof.

Plaintiff finally asserts that the defendant has waived its right to any setoffs since this issue was not raised until a motion to mold the verdict was presented to the court at post-trial. The order of October 29, 1998,

issued by the Honorable Albert W. Sheppard Jr. of this court, pertaining to all orthopedic bone screw litigation cases (there are similar orders involving all other civil cases involving the PIC insolvency as well), specifically provides that this issue is to be raised in post-trial after verdict. Consequently, the defendant did not waive the right to any setoffs.

---

### EXHIBIT

### PANEA v. ISDANER

BERNSTEIN, *J.*, January 6, 1999—Plaintiffs Doina and John Panea filed this medical malpractice action against defendants Neil Isdaner M.D. and Neil Isdaner M.D. P.C. in November 1995. On December 11, 1997, the parties agreed to settle this case for $75,000. Plaintiffs' counsel sent an executed release and an order to settle, discontinue and end to defense counsel on December 31, 1997. At the time of settlement, both defendants were insured by Physicians Insurance Company (PIC). On January 21, 1998, the Commonwealth Court ordered PIC into liquidation.

Plaintiffs' counsel sent a letter to the Pennsylvania Insurance Guaranty Association (PIGA) requesting payment of $75,000. PIGA tendered the sum of $50,000 to plaintiffs, claiming that it is entitled to a $25,000 credit pursuant to the Pennsylvania Property and Casualty Insurance Guaranty Act.[1] Plaintiffs assert that they are entitled to recover an additional $25,000 from either PIGA or defendants personally. Defendants assert that neither PIGA nor the named defendants are liable for the full $75,000.

---

1. 40 P.S. §991.1801 et seq.

On September 24, 1998, plaintiffs filed a petition to enforce settlement against defendants, seeking an order of judgment against defendants in the amount of $25,000 plus accrued interest. This court denied plaintiffs' petition on November 3, 1998. From this order, plaintiffs timely appealed.

The sole issue on appeal is whether plaintiffs' health insurance payment of $25,000 bars them from further recovery against either PIGA or defendants personally. For the following reasons, this court's denial of plaintiffs' petition was proper and should be affirmed.

PIGA exists under the Pennsylvania Property and Casualty Insurance Guaranty Act (the PIGA statute).[2] The legislature's enactment of the PIGA statute on December 12, 1994 repealed former 40 P.S. §1701.101 et seq.[3] The purpose of the PIGA statute is "[t]o provide a means for the payment of covered claims under certain . . . casualty insurance policies . . . and to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer."[4] The legislature created PIGA to protect the claimants of insolvent insurers who have no other source of insurance from which to recover their losses.[5]

When it enacted the new PIGA statute, the legislature made significant changes in the former statute's non-duplication of recovery provision. Both statutes require a claimant to first exhaust his rights under any other insurance policy before requesting payment from PIGA.

---

2. 40 P.S. §991.1803.

3. The new PIGA statute became effective on February 10, 1995, 60 days after its enactment. See 40 P.S. §991.1801.

4. 40 P.S. §991.1801(1).

5. *Burke v. Valley Lines Inc.,* 421 Pa. Super. 362, 368, 617 A.2d 1335, 1338 (1992).

Under both statutes, PIGA is entitled to a credit equal to the amount that the claimant recovers under any other insurance. The specific change in the PIGA statute which is at issue in this case is the type of other recovery that entitles PIGA to an offset. The former statute provided:

"Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall first be required to exhaust his right under such a policy. Any amount payable on a covered claim under this Act shall be reduced by the amount of any recovery under such insurance policy."[6]

The Superior Court limited the application of this provision to the recovery of insurance benefits from a "covered claim."[7] In *Sands v. Pennsylvania Insurance Guaranty Association,* the Superior Court held that payments by an insurance carrier which did not result from the insolvency of an insurer were not subject to an offset.[8] The Superior Court stated:

"A 'claim against an insurer' would 'also be a covered claim' only if that claim was for an 'unpaid claim' arising under an insurance policy of an 'insolvent insurer.' Any claim Sands might have had against Hawkeye under a liability policy could not have also been a covered claim because it would not be a claim for an unpaid claim resulting from the insolvency of an insurer but from the negligence of Davis."[9]

---

6. 40 P.S. §1701.503(a) (repealed December 12, 1994).

7. In the former statute, a "covered claim" was defined as "an unpaid claim, including a claim for unearned premiums, which arises under a property and casualty insurance policy of an insolvent insurer . . . ." 40 P.S. §1701.103(5)(a) (repealed December 12, 1994).

8. 283 Pa. Super. 217, 224, 423 A.2d 1224, 1227 (1980).

9. *Id.* at 224, 423 A.2d at 1227.

In 1983, the Superior Court in *Bullock v. Pariser* explained its prior interpretation of section 1701.503(a) by stating that "the second sentence of section 503(a) . . . refers back to any recovery on a claim of the sort referred to in the first sentence of section 503(a), *i.e.*, any 'covered claim.' " [10] In both *Sands* and *Bullock*, PIGA was not entitled to an offset because the claimant's other insurance recovery was not a "covered claim."

In response, the legislature abandoned this interpretation of the PIGA statute by repealing 40 P.S. §1701.-503(a) and replacing it with 40 P.S. §991.1817(a). The legislature remedied the ambiguity in the former statute by clearly defining the types of other insurance that would entitle PIGA to a credit. The new PIGA statute provides:

"Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under *any kind of insurance,* whether it is a first-party or third-party claim and s*hall include, without limitation, accident and health insurance,* workers' compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. *Any amount payable on a covered claim under this Act shall be reduced by the amount of any recovery under other insurance.*" [11]

The new PIGA statute specifically includes health insurance in its definition of "a claim under an insurance policy." [12] Thus, the unambiguous language of the new

10. 311 Pa. Super. 487, 494, 457 A.2d 1287, 1290 (1983).

11. 40 P.S. §991.1817(a). (emphasis added)

12. Plaintiffs admit that "[t]he present version of the statute clearly applies to health insurance benefits received by the plaintiff even if the receipt of such benefits did not result from the insolvency of any insurer." Memorandum of law in support of plaintiffs' petition

PIGA statute precluded plaintiffs from recovering against PIGA the sum paid by their health insurance.

Plaintiffs argue, however, that the new PIGA statute cannot be applied to a cause of action that accrued prior to its effective date because the statute relates to substantive rights.[13] The new PIGA statute clearly applies to an unpaid claim against an insurer that is declared insolvent *"after the effective date of this article* by a court of competent jurisdiction."[14] PIC was declared insolvent by the Commonwealth Court on January 21, 1998, nearly three years after the new PIGA statute's effective date of February 10, 1995. Since defendants' insurance carrier was declared insolvent after that effective date, the new PIGA statute is applicable.

In *Blackwell v. Pennsylvania Insurance Guaranty Association,* a remarkably similar case, the Superior Court held that all sums paid to the claimant by her own underinsured motorist carrier must be deducted from any sums paid by PIGA.[15] Interpreting the nonduplication of recovery provision in light of the policies and intent of the statute, the court stated:

"[T]he legislature did *not* intend, in enacting the Insurance Guaranty Act, that in all cases a claimant would be placed in the *same* position he would have been in had the insurance company remained solvent. Even with the existence of PIGA, it was anticipated by the legislature that some claimants would suffer some

to enforce settlement against defendants, Neil Isdaner M.D. and Neil Isdaner P.C., p. 6.

13. Memorandum of law in support of plaintiffs' petition to enforce settlement against defendants, Neil Isdaner M.D. and Neil Isdaner P.C., pp. 6-7.

14. 40 P.S. §991.1802.

15. 390 Pa. Super. 31, 38, 567 A.2d 1103, 1107 (1989).

amount of financial loss due to the insolvency of an insurer . . . ."[16]

As the Superior Court recognized in *Blackwell,* the PIGA statute does not guarantee that plaintiffs in this case will be placed in the same position they would have been in had PIC remained solvent. Since the new PIGA statute applies and plaintiffs have received the sum of $25,000 from their health insurance carrier, they may not also recover that sum from PIGA.

Alternatively, plaintiffs claim that if PIGA is not liable for the full amount of the settlement, then defendants are personally liable in the amount of $25,000. In *Burke v. Valley Lines Inc.,* the Superior Court recognized that to impose such financial loss directly on the insured tort-feasor "would violate the very purpose of PIGA . . . ."[17] In *Burke,* the plaintiff brought a personal injury action against the tort-feasor and his employer after he had settled his uninsured motorist claim for less than the policy limits. Following trial, the plaintiff sought to recover the difference between the jury award and the payment from his insured motorist carrier from the defendants personally. In holding that the plaintiff was barred from recovering against either PIGA or the defendants, the Superior Court stated:

"Given PIGA's release from all financial responsibility as a direct result of appellant's failure to exhaust

16. *Id.* at 37, 567 A.2d at 1106. (emphasis in original) Although *Blackwell* was decided when the former statute was in effect, its holding still applies in this case. Despite the substantive differences between the two PIGA statutes, the stated purpose of each statute is the same—"to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer." See 40 P.S. §991.1801(1); 40 P.S. §1701.102(1) (repealed December 12, 1994).

17. 421 Pa. Super. 362, 370, 617 A.2d 1335, 1339 (1992) (citing 40 P.S. §1701.102(1)).

his uninsured policy rights, we hold that appellant is likewise barred from recovering from appellees. Any other holding would render the 'exhaustion' provision of the Insurance Guaranty Act meaningless. . . .

"If appellees were now personally responsible for appellant's damages award, they would be without any source of insurance protection to bridge the gap between appellant's uninsured motorist settlement of $85,000 and the $200,000 award." [18]

Therefore, since plaintiffs herein are barred from recovering against PIGA, they are likewise barred from recovering against the insured tort-feasors.

Accordingly, based on the PIGA statute's unambiguous language and controlling precedent, neither PIGA nor the named defendants are liable to plaintiffs for the sum paid by plaintiffs' health insurance. For the foregoing reasons, this court properly denied plaintiffs' petition to enforce settlement against defendants, and its ruling should be affirmed.[19]

---

18. *Id.* at 369, 617 A.2d at 1338-39. See also, *White v. Accardo,* 15 D.&C.3d 609, 617 (C.P. Phila. County 1980) (holding plaintiff barred from recovering against named defendants where PIGA was released from all financial responsibility due to plaintiff's failure to exhaust policy rights).

19. Clearly, the understanding of the parties in reaching the settlement agreed upon before PIC's insolvency no longer exists. At that time, the parties contemplated payment in the amount of $75,000 without reduction for collateral source benefits. Defendants agreed to this settlement with the understanding that all sums would be paid by their insurance carrier. These understandings have been obliterated by the insolvency. Obviously, the settlement can be ruled null and void and the underlying matter restored to the trial list. No such request is before the court. In ruling on the instant petition, the court notes that plaintiffs have not requested any declaration that the settlement is null and void nor that the case be ordered for trial.

EXHIBIT

## GALLAHER v. WETZEL

SWOPE, JR., *J.,* December 4, 1998—This matter is before the court on defendants' petition to satisfy the judgment filed October 23, 1998. On November 12, 1998, a hearing was held at which time arguments of counsel were heard.

On August 14, 1998, the jury reached a verdict for each of the three plaintiffs in this medical malpractice case concerning the premature birth and death of Nicholas Gallaher. The unanimous jury verdict awarded $76,622.35 to Tisha Gallaher, $25,000 to Carl Gallaher, and $25,248 to the estate of Nicholas Gallaher. On September 8, 1998, this court entered an order awarding delay damages in the amount of $2,501.37 with respect to the verdict for Carl Gallaher, $7,666.43 with respect to the verdict for Tisha Gallaher, and $2,526.18 with respect to the verdict for the estate of Nicholas Gallaher.

On October 5, 1998, judgments were entered for Carl Gallaher in the amount of $27,501.37 and for Tisha Gallaher in the amount of $84,288.78. The court did not enter judgment with respect to the estate of Nicholas Gallaher because there was then pending a motion by the plaintiffs requesting a new trial as to damages on the estate of Nicholas Gallaher. The combined total of the judgments for Carl and Tisha Gallaher is $111,790.15. The defendants paid $99,947.50 and brought the instant petition asking that the judgment be marked satisfied.

The issue currently before the court concerns only the claim of Tisha Gallaher. Her claim included medical expenses in the amount of $11,842.65. These medical bills were paid by the plaintiffs' hospitalization insur-

ance. At the time of the incident giving rise to the claim, the defendant, Dr. Wetzel, was insured by Physicians Insurance Company (PIC) under a standard policy of primary insurance with a policy limit of $200,000. On January 21, 1998, PIC was declared insolvent by the Commonwealth Court and its insureds and claimants against its insureds became subject to the Pennsylvania Property and Casualty Insurance Guaranty Association (PPCIGA) Act by reason of PPCIGA's assumption of the position as primary insurer, subject to the limitations of the Pennsylvania Property and Casualty Insurance Guaranty Association Act.

Subsequent to the entry of judgment, and in accordance with the statute, PPCIGA paid to the plaintiffs the sum of $99,947.50 representing payment of the verdicts in the claim of Tisha and Carl Gallaher, together with delay damages thereon, minus the statutory credit or offset of $11,842.65 provided in 40 P.S. §991.1817(a). After receiving $99,947.50, the plaintiffs made demand upon the insured, Dr. Wetzel, for the payment of the $11,842.65 which was not paid by PPCIGA. The defendants now seek to satisfy the judgment and the plaintiffs contend that they have a right to execute on the judgment against Dr. Wetzel. The plaintiffs have set forth four separate grounds for relief in their argument against the defendants' petition to satisfy the verdict. They assert that: (1) the Act does not permit the court to set off the verdicts against the defendants, (2) the defendants do not have standing to assert a setoff because that right is held solely by PPCIGA,[1] (3) the

1. The court finds this argument not worthy of discussion, as *Burke v. Valley Lines Inc.,* 421 Pa. Super. 362, 617 A.2d 1335 (1992), clearly stands for the proposition that the right of setoff provided by former section 503(a) (now section 991.1817(a)) belongs to both the tort-feasor as well as PPCIGA.

satisfaction of the judgment would violate the collateral source rule,[2] and (4) the defendants waived any right to reduce the amount of the verdict by failing to file a motion to mold the verdict within 10 days of the verdict.[3]

In support of their petition, defendants have argued that the verdict was satisfied by the payment of other insurance (the plaintiff, Tisha Gallaher's, Blue Cross hospitalization insurance) and that this sum may not be recovered from Dr. Wetzel personally.

The sole issue before the court is whether the $99,947.50 paid by PPCIGA, along with the payment by Tisha Gallaher's hospitalization insurance, amounts to a full satisfaction of the judgment and bars any recovery of the offset sum from the insured, Dr. Wetzel. The plaintiffs have argued that the Act does not allow the court to set off the verdict in favor of the defendants. As will be explained, the court finds that the offset of $11,842.65 may not be recovered from Dr. Wetzel

---

2. The court declines to address this argument, finding that it has no merit whatsoever, as there is no authority for the proposition that the collateral source rule is applicable to the non-duplication of recovery provision of PPCIGA.

3. The court also finds this argument to be without merit, determining that the defendants have not waived their right to the setoff provided by 40 P.S. §991.1817(a). Plaintiffs have argued that *Sands v. Pa. Ins. Guar. Assoc.,* 283 Pa. Super. 217, 423 A.2d 1224 (1980) supports their assertion that the defendants have waived their right to a setoff. However, *Bullock* is inapplicable to the instant case, because the *Bullock* court held that PIGA had waived its right to a setoff, primarily because the court was unable to determine what portion of the award, if any, PIGA was entitled to have set off. In the case at bar, unlike the situation presented in *Bullock,* there is no question that the amount of the setoff is $11,842.65.

personally, and, as such, the court will satisfy the judgment.

The resolution of the unique issue presented turns on the application of the section in question, 40 P.S. §991.1801, entitled "Non-duplication of recovery." This section provides in pertinent part:

"Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance, whether it is a first-party or third-party claim, and *shall include, without limitation, accident and health insurance, workers' compensation, Blue Cross and Blue Shield* and all other coverages except for policies of an insolvent insurer. Any amount payable on a covered claim under this Act shall be reduced by the amount of any recovery under other insurance." 40 P.S. §991.1817(a). (emphasis added)

In essence, before calling on PPCIGA to pay any claim under a policy issued by an insolvent insurer, a claimant, in this case the plaintiff, Tisha Gallaher, first must exhaust her rights under all other insurance policies which cover any part of her claim. This "exhaustion" provision entitles PPCIGA to reduce its payment to the claimant, Tisha Gallaher, by the amount she recovered from other insurance, in this case the $11,842.65 of medical bills previously covered by her hospitalization insurance. The language of the section very plainly indicates that health insurance is one type of other insurance that will offset the amount of recovery from PPCIGA. Thus, the Act prohibits PPCIGA from making payments that would constitute a double recovery, as would payment to the plaintiffs of the $11,842.65 at issue.

Certainly, it is clear that PPCIGA cannot be required to pay any more than the $99,947.50 that it has already

paid out to the plaintiffs. The court also holds that Dr. Wetzel herself cannot be required to pay out the $11,842.65 that was not paid by PPCIGA. We rely on the stated policy purposes of the Act and recent case law interpreting the Act in reaching this decision.

By way of statutory background, in November of 1970, Pennsylvania enacted the Pennsylvania Insurance Guaranty Association Act to provide insurance policyholders with a means to recover payment of claims against insolvent insurers. See *H.K. Porter Co. Inc. v. Pennsylvania Insurance Guaranty Association,* 75 F.3d 137, 140 (3d Cir. 1996). The Act and the statutory creation of the Pennsylvania Insurance Guaranty Association were modeled on a bill created by the National Association of Insurance Commissioners in order to address the social harm that occurs when insurance companies declare insolvency. See *id.* (citing *Sands v. Pennsylvania Insurance Guaranty Association,* 283 Pa. Super. 217, 219, 423 A.2d 1224, 1225-26 (1980)).

The PIGA Act was repealed on December 12, 1994, and replaced by the Pennsylvania Property and Casualty Insurance Guaranty Association Act, 40 P.S. §991.1801 et seq., which amended the prior law. See 1994, Dec. 12, P.L. 1005, no. 137. In reaching its decision, the court notes that one of the stated purposes of the PPCIGA Act, set forth in 40 P.S. §991.1801, is "[t]o provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claim and *to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer.*" (emphasis added) There is no question that Dr. Wetzel was covered by a policy of liability insurance, that her insurer, Physicians Insurance Company, is insolvent, and that the claim in issue was a covered claim To expose Dr. Wetzel to

financial harm in this case would defeat the stated policy goals of the legislation. If Dr. Wetzel was now subject to liability for the $11,842.65 at issue, she would be left without a source of insurance protection, and subject to financial loss due to the unfortunate insolvency of her insurer and contrary to the purpose of the Act.

Although there is a split of authority among panels of the Pennsylvania Superior Court on this issue, the court finds the reasoning in *Burke v. Valley Lines Inc.,* 421 Pa. Super. 362, 617 A.2d 1335 (1992) to be compelling, as well as more closely on point. At the outset, the court would note that all three Superior Court cases cited were decided prior to the 1994 amendments to PPCIGA. In *Burke,* a three-judge panel addressed whether an injured motorist was required to obtain the full policy limit under his own uninsured motorist coverage before he could collect a judgment from a tortfeasor covered by the Pennsylvania Insurance Guaranty Association Act. *Burke v. Valley Lines Inc.,* 421 Pa. Super. 362, 363, 617 A.2d 1335, 1336 (1992). The court held that an injured person may not settle with his uninsured motorist carrier for less than the policy limits and then expect to recover any monies from PIGA or its insured. *Id.* The court specifically held that the injured person could not recover from PIGA *or from the tort-feasor/policyholder.* The court reasoned as follows:

"Since appellant settled his uninsured motorist claims for less than his policy limits of $200,000, appellant has not exhausted his rights under the policy and therefore, may not recover from PIGA. 40 Pa. S.A. §1701.-503(a) [former section]. Having determined that appellant may not recover against PIGA, we must next face the question of whether appellant is barred from recovering his $200,000 damage award from appellees.

Given PIGA's release from all financial responsibility as a direct result of appellant's failure to exhaust his uninsured policy rights, we hold that appellant is likewise barred from recovering from appellees. Any other holding would render the 'exhaustion' provision of the Insurance Guaranty Act meaningless." *Id.* at 369, 617 A.2d at 1335 (citing *White v. Accardo,* 15 D.&C.3d 609, 617 (1980)).

The court further noted that "PIGA was designed to provide claimants with a recovery equal to the insolvent insurer's policy limits (or PIGA's liability cap) less whatever amount the claimant may have recovered by exhausting his rights under any other policy of insurance." *Id.* at 368-69, 617 A.2d at 1338.

Although *Burke* dealt with a reduction in the amount recoverable from an uninsured motorist carrier, the principle involved can be applied to the instant case. In *Burke,* the setoff amount was determined to be the sum that the plaintiff was entitled to recover from other insurance. In the case at bar, the plaintiffs did actually recover from other insurance the $11,842.65 in controversy. In both cases, the setoffs or reductions that PPCIGA claims are also not recoverable against the insured party. The judgment has been satisfied by the plaintiffs' receipt of PPCIGA's payment of $99,947.50 and her health insurance company's coverage of the $11,842.65 worth of medical expenses, and cannot be recovered from Dr. Wetzel.

In contrast to *Burke,* the plaintiffs have cited the cases of *Bullock v. Pariser,* 311 Pa. Super. 487, 457 A.2d 1287 (1983) and *Sands v. Pennsylvania Insurance Guaranty Association,* 283 Pa. Super. 217, 423 A.2d 1224 (1980), as support for their argument that the verdict in this case should not be reduced by the setoff amount of $11,842.65. At the outset, the court would note that both cases were decided in the early 1980s, well before the 1994 amendments to 40 P.S.

§991.1817(a). The cases cited by the plaintiff rest their decisions on the determination that the second sentence of former section 503(a),[4] which provided for the reduction of any amount payable under the Act "by the amount of any recovery under such insurance policy," referred back to any recovery on a claim of the sort referred to in the first sentence of former section 503(a), *i.e.,* any "covered claim." Due to this interpretation, *Bullock* and *Sands* created a distinction by which payments a claimant would have received regardless of the insurance carrier's insolvency were not covered by the Act and thus the claimant's recovery could not be reduced by those amounts. However, this distinction is no longer viable as a result of the 1994 amendment.

The 1994 amendments to 40 P.S. §991.1817(a)[5] establish that a claim under an insurance policy for purposes of the Act includes any kind of insurance and, in particular, state that accident and health insurance, workers' compensation, Blue Cross and Blue Shield are encompassed by the section. The court understands

---

4. Prior to the 1994 amendments, the section in issue, section 503(a) of the Act, provided as follows:

"Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall first be required to exhaust his right under such a policy. Any amount payable on a covered claim under this Act shall be reduced by the amount of any recovery under such insurance policy."

5. The current text of 40 P.S. §991.1817(a) provides:

"Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance, whether it is a first-party or third-party claim, and shall include, without limitation, accident and health insurance, workers' compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. Any amount payable on a covered claim under this Act shall be reduced by the amount of any recovery under other insurance."

this section to mean that any and all claims that a claimant may have under any policy of insurance must be exhausted, and recovery under a covered claim shall be reduced by the amount of other insurance proceeds previously received. As such, it is irrelevant whether that claim arose and payment was made due to the insolvency of the tort-feasor's insurance carrier or if it would have been due to the claimant regardless of the insolvency.

In sum, we hold that the plaintiffs' recovery of other insurance (hospitalization coverage), within the meaning of 40 P.S. §991.1817(a), bars any subsequent recovery of that amount from either PPCIGA or the tort-feasor. So holding, we note that our interpretation both upholds the purpose of the statute in question, and is fair to both parties.

Accordingly the following order is entered:

## ORDER

And now, December 4, 1998, upon consideration of the arguments of counsel and briefs submitted, it is hereby ordered and decreed that the defendants' petition to satisfy the judgment is granted and the judgment shall be deemed satisfied.