**RHODE ISLAND INSURERS' INSOLVENCY FUND**

v.

**Roger T. BENOIT et al.**

**No. 97–291–Appeal.**

Supreme Court of Rhode Island.

Jan. 26, 1999.

**304**

Joseph C. Tanski, Boston, MA, Stephen P. Maguire, Cranston, Stephen Thomas Morrissey, Wakefield, for plaintiff.

Michael T. Finan, Pawtucket, Richard I. Abrams, Robert J. Dumouchel, Providence, Fred J. Volpe, Kingstown, Patricia M. Watson, for defendant.

Present: WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

May the Rhode Island Insurers' Insolvency Fund offset the amount due from an insolvent insurer in the event the claimant has not received full compensation for damages? The defendants, Raymond Peltier and Carol Peltier (Peltiers), as individuals and in their capacity as co-administrators of the Estate of Lisa Peltier (estate), have appealed the entry of a summary judgment in favor of the plaintiff, the Rhode Island Insurers' Insolvency Fund (fund). The fund had filed a motion for summary judgment, and a defen-

dant, Roger T. Benoit (Benoit), filed a cross-motion for summary judgment. After hearing argument on the cross-motions, the Superior Court entered a summary judgment in favor of the fund. The Peltiers appealed. We sustain the appeal.

### Facts and Procedural History

On November 16, 1990, a vehicle driven by Cynthia A. Murray (Cynthia) and owned by Jacqueline M. Murray, collided with a vehicle owned, driven, and solely occupied by Benoit on Route 3 in West Greenwich, Rhode Island. Cynthia sustained injuries as a result of the accident, and Lisa Peltier, riding with Cynthia, died as a result of injuries.

At the time of the accident, Benoit had a liability insurance policy issued by American Universal Insurance Company (American Universal), with bodily injury liability limits of $25,000 per person and $50,000 per accident. After a court of competent jurisdiction declared American Universal insolvent on January 8, 1991, the fund became responsible for covered claims arising out of American Universal insurance policies. On February 14, 1991, the fund sent a letter directing the Peltiers to exhaust all rights against other available insurance policies prior to seeking recovery from the fund.

At the time of the accident, the Peltiers were insureds under an automobile liability policy issued by John Hancock & Casualty Insurance Company (John Hancock), which included an uninsured motorist provision. Pursuant to this provision, the estate collected uninsured motorist benefits of $50,000 and medical payment benefits of $5,000 from John Hancock. The Peltiers made a demand upon the fund for the $25,000 policy limits of Benoit's American Universal policy. On August 16 and November 21, 1995, the Peltiers offered to release all claims relating to Benoit and his insurance carrier in exchange for the $25,000. The fund, however, refused to negotiate or to pay the $25,000 to the estate. As a result, the Peltiers filed a negligence/wrongful death action against Benoit and a dram shop action against Marilyn Al-

bro, d/b/a Mishnock Barn and Lake Mishnock Grove, Inc.[1]

On March 15, 1996, the fund filed a complaint for declaratory judgment in the Superior Court, in which the fund requested:

"1. A declaration that the Fund is not obligated to pay any amount to Raymond Peltier and Carol Peltier individually or as administrators of the estate of Lisa Peltier; and

"2. A declaration that Raymond Peltier and Carol Peltier individually and as administrators of the estate of Lisa Peltier may not recover from Roger T. Benoit except to the extent the amount recoverable from Roger T. Benoit exceeds $50,000."

Benoit filed a counterclaim for declaratory judgment, requesting that the court declare: that insurance coverage in the amount of $25,000 was available; that the fund be held responsible for all costs and expenses incurred by Benoit in defense of the fund's declaratory judgment action and, should a judgment be entered against Benoit in the Peltier's negligence/wrongful death action, that the fund be held responsible for all sums for which American Universal would have been responsible. The fund then filed a motion for summary judgment, and Benoit filed a cross-motion for summary judgment. On December 17, 1996, the Superior Court heard argument on the motions and subsequently entered an order and judgment granting a summary judgment in favor of the fund, finding that the Peltiers were precluded by G.L. 1956 § 27–34–12(a) from recovering any amount from the fund. The trial justice also ruled that Benoit was shielded from liability for the amount his insurer would have paid the estate had it not become insolvent, and that he was responsible for any amount beyond the $25,000 limit of his American Universal policy. The fund moved for entry of judgment on December 23, 1996, and on January 2, 1997, the trial justice granted the fund's motion and denied Benoit's cross-motion for summary judgment. On the same date, the Peltiers appealed.

On appeal, the fund argued that the amount due from the fund could be set off against any recovery a claimant received from other available insurance. Specifically, the fund maintained that because John Hancock paid the Peltiers $50,000, an amount that exceeded the fund's liability of $25,000 under the insolvent American Universal policy, the fund had no financial obligation to the Peltiers. The fund also alleged that the trial court correctly ruled that the Peltiers only may recover from Benoit to the extent that any judgment against Benoit exceeded the $25,000 limits of Benoit's American Universal policy.

## Standard of Review

"Summary judgment is an extreme remedy that should be applied cautiously." *Sjogren v. Metropolitan Property and Casualty Insurance Co.*, 703 A.2d 608, 610 (R.I.1997). This Court will affirm a summary judgment only if we determine in our review, made in the light most favorable to the nonmoving party, that no genuine issues of material fact exist, and if we conclude that the moving party is entitled to judgment as a matter of law. *Id.; Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1225 (R.I. 1996); *Mallane v. Holyoke Mutual Insurance Co.*, 658 A.2d 18, 20 (R.I.1995).

## Insolvency Fund

Established pursuant to the Rhode Island Insurers' Insolvency Fund Act (act), chapter 34 of title 27, the fund is endowed by assessments on liability insurance carriers doing business in the state of Rhode Island. Section 27–34–8(3). The insurers in turn charge their insureds higher premiums to cover the cost of supporting the fund. Section 27–34–15. Pursuant to § 27–34–2, the fund was created to provide a framework for the payment of covered claims made against insolvent insurers in order "to avoid excessive delay in payment and *to avoid financial loss to claimants or policyholders because of the insolvency of an insurer,* and to create an entity to assess the cost of the protection and

---

1. Benoit's blood alcohol level at the time of the accident was .208, over twice the legal limit. G.L.1956 § 31–27–2(b)(1), as amended by P.L. 1990, ch. 496, § 1. *See State v. Benoit,* 650 A.2d 1230, 1231 (R.I.1994).

distribute it equitably among member insurers." (Emphasis added.)

■ Under the act, the fund is bound to assume the obligations of an insolvent insurer, as if that insurer had not become insolvent. Section 27–34–8(a)(2). We have long held "that an insurer must act in a reasonable manner and in good faith in settling third-party claims against its insured." *Medical Malpractice Joint Underwriting Association of Rhode Island v. Rhode Island Insurers' Insolvency Fund,* 703 A.2d 1097, 1101 (R.I.1997) (citing *Bibeault v. Hanover Insurance Co.,* 417 A.2d 313, 318 (R.I.1980)). The act imposes upon the fund, therefore, a duty to act in good faith regarding claims brought against policyholders. *Medical Malpractice,* 703 A.2d at 1100–01; *Rumford Property and Liability Insurance Co. v. Carbone,* 590 A.2d 398, 400 (R.I.1991). The obligation of the fund to any claimant is statutorily capped at $300,000 per claimant for a covered claim, § 27–34–8(a)(1)(iii), but apart from that limit, the fund shall "[b]e deemed the insurer to the extent of its obligation on the covered claims and to that extent shall have all of the rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." Section 27–34–8(a)(2). The act further directs the fund to "[i]nvestigate claims brought against the fund and adjust, compromise, settle, and pay covered claims to the extent of the fund's obligation." Section 27–34–8(a)(4).

### Nonduplication Provision

The Peltiers made two demands on behalf of the estate in respect to the November 16, 1990 accident: the $50,000 uninsured motorist coverage claim against their own insurance carrier, John Hancock; and the $25,000 claim against Benoit's insolvent insurer, American Universal.

■ The fund advised the Peltiers that before its responsibility to pay their $25,000 claim could arise, the Peltiers were required to proceed against any other available insur-

ance policies and exhaust such potential coverage. Accordingly, the Peltiers filed a claim with John Hancock, and the estate received $50,000 in uninsured motorist benefits and $5,000 in medical benefits. It is not clear from the record whether the Peltiers filed the uninsured motorist claim for relief in respect to Benoit's underinsurance or Murray's lack of insurance. At oral argument, the Peltiers stated that the claim related to the lack of insurance on Jacqueline Murray's vehicle. The release and trust agreement (release) that the Peltiers signed upon receiving the disbursement from John Hancock unfortunately does not provide an answer to this question. By signing the document, the Peltiers apparently released all claims they might have had against John Hancock "arising out of an accident with an uninsured automobile operated by Roger T. Benoit."[2] This language is ambiguous, because although naming Benoit, it apparently does so only as a method of identifying from which claims the Peltiers agreed to hold John Hancock harmless, namely, claims arising from the accident with Benoit's vehicle. Therefore, the language of the release does not constitute clear evidence that the Peltiers collected their uninsured motorists coverage as an alternate source of insurance for their claims against Benoit. Importantly, the release does not purport to release Benoit; only John Hancock was released from any additional claims.

■ The fund, however, argued that it was entitled to offset any recovery due from the fund by the $50,000 received by the estate. For this proposition, the fund cited the nonduplication provision of the act, which provides that:

"Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his or her right under that policy. Any amount payable on a covered claim under this chapter

---

**2.** "The policyholder of an insolvent insurer comes within the definition of an uninsured motorist for the purpose of *** uninsured motorist coverage." *Higginbotham v. Rossi,* 1994 WL 930978 at *2 (R.I.Super.1994). *See also* G.L.

1956 § 27–7–2.1(a) (stating in relevant part that uninsured motorist coverage applies "in the case of a responsible party whose liability insurance carrier was insolvent at the time of the accident or became insolvent subsequent thereto").

shall be reduced by the amount of any recovery under the insurance policy." Section 27–34–12(a).

The fund claimed that this language clearly authorized it to offset dollar-for-dollar all monies the Peltiers recovered under any alternate insurance policy. We are not persuaded that the act is clear on this point. Rather, we agree with the jurisdictions that have held that "[t]he language is ambiguous if not contradictory," *International Collection Service v. Vermont Property & Casualty Insurance Guaranty Association,* 150 Vt. 630, 555 A.2d 978, 980 (Vt.1988), that "the interrelationship of the clauses and phrases is confusing," *Gimmestad v. Gimmestad,* 451 N.W.2d 662, 664 (Minn.Ct.App.1990), and that the section is "neither a model of clarity nor an exemplar of the draftsman's craft." *Arizona Property & Casualty Insurance Guaranty Fund v. Herder,* 156 Ariz. 203, 751 P.2d 519, 523 (Ariz.1988).

> "This ambiguity of syntax and antecedent has lead [*sic*] to differing interpretations of nearly identical language. For instance, one jurisdiction requires exhaustion and/or offset when a claim fits the statutory definition of a 'covered claim.' *** Another jurisdiction has interpreted a similar provision as requiring offset only when double recovery would otherwise result." *Gimmestad,* 451 N.W.2d at 664.

We have held repeatedly that "when interpreting a legislative enactment that contains ambiguous language, we 'constru[e] the enactment so as to effectuate the intent of the Legislature. *** In so doing, this Court examines statutory provisions in their entirety, attributing to the act the meaning most consistent with the policies and purposes of the Legislature.'" *Providence Journal Co. v. Rodgers,* 711 A.2d 1131, 1134 (R.I.1998). (Alterations in original.) It is our opinion that the legislative purpose of the setoff provision is the prevention of double recovery. "A claimant should not receive greater recovery than if the insolvent insurer had remained solvent." *Gimmestad,* 451 N.W.2d at

665. Mindful of this purpose, we proceed to untangle the provision at issue.

The nonduplication provision, § 27–34–12(a), refers to the exhaustion and offset of "covered claims." The act defines a "covered claim," in relevant part as:

> "an unpaid claim, including one for unearned premiums, submitted by a claimant, which arises out of and is within the coverage and subject to the applicable limits of an insurance policy to which this chapter applies issued by an insurer, if the insurer becomes an insolvent insurer on or after July 1, 1988." Section 27–34–5(8).

The threshold question, then, is whether the $50,000 uninsured motorist claim made against John Hancock qualifies as a covered claim.

■ The court in *Sands v. Pennsylvania Insurance Guaranty Association,* 283 Pa.Super. 217, 423 A.2d 1224, 1227 (Pa.Super.Ct.1980), interpreting an essentially identical nonduplication provision, held that a claim is a "covered claim" only if it results from the insolvency of an insurer. Here, the Peltiers' uninsured motorist claim was made against John Hancock, a solvent, not an insolvent, insurer.[3] Like the *Sands* court, we read the phrase "any recovery under the insurance policy" in the second sentence of § 27–34–12(a) to refer to the recovery made pursuant to the first sentence of the section, which deals with exhaustion. *Sands,* 423 A.2d at 1228. A recovery made pursuant to the first sentence must, therefore, be on a covered claim. The second sentence of § 27–34–12(a) clearly references the first, and the first sentence refers only to covered claims. Therefore it is impossible to conclude that the second sentence allowing offset contemplated the offset of a noncovered claim. *Sands,* 423 A.2d at 1227–28. Therefore, under § 27–34–12(a), the fund may only offset a covered claim. This reasoning is consistent with one of the purposes of the act, namely, to avoid loss resulting from the insolvency of an insurer. Section 27–34–2.

---

**3.** The Supreme Court of Louisiana has held that the nonduplication provision was designed to apply only to ordinary liability coverage, not to uninsured motorist coverage. *Hickerson v. Protective National Insurance Co.,* 383 So.2d 377,

379 (La.1980). In the instant case, however, the result under either *Sands* or *Hickerson* is the same, because the Peltiers' claim against John Hancock was not a covered claim but a claim for uninsured motorists coverage.

Because John Hancock is not an insolvent insurer, and because the $50,000 recovery was clearly not "within the coverage and subject to the applicable limits" of the American Universal policy as required by the definition of a covered claim, the Peltiers' claim under their John Hancock policy was not a covered claim and thus did not fall within the purview of § 27–34–12(a). Because the $50,000 claim made against John Hancock is not a covered claim as defined by the act, the fund has no support for its position that it may offset the amount it owed on Benoit's American Universal policy by the Peltiers' recovery from John Hancock.

■ The Peltiers, as co-administrators of the estate, brought an action against Benoit for the wrongful death of their daughter Lisa. If Benoit is found liable under G.L.1956 §§ 10–7–1 through 10–7–4, Benoit "shall be liable in damages in the sum of not less than one hundred thousand dollars ($100,000.00)." Section 10–7–2. Because the estate received only $50,000 from John Hancock, the estate was not compensated in full for potential damages, which, if Benoit is found liable, would be at least $100,000. In our opinion, the fund may not offset the amount due from an insolvent insurer in the event a claimant has not received full compensation for damages. In this case, therefore, the fund may not apply the estate's partial recovery as an offset to the amount due from the fund. By so holding, we achieve a result that conforms with "the intent of the section to prevent a duplication of recoveries, and comports with the act's purpose to leave a claimant in the same position as if there had been no insolvency." *International Collection Service,* 555 A.2d at 980.

### Settlement Negotiations

■ Next, we address the Fund's argument that it "could not" participate in settlement negotiations with respect to the $25,000 claim made by the estate. The act provides that the fund shall "[i]nvestigate claims brought against the fund and *adjust, compromise, settle, and pay covered claims to the extent of the fund's obligation.*" Section 27–34–8(a)(4). (Emphasis added.) The $25,000 claim against the fund was indisputably a

covered claim as defined in § 27–34–5(8), which provides in relevant part that a "'[c]overed claim' means an unpaid claim *** submitted by a claimant, which arises out of and is within the coverage and subject to the applicable limits of an insurance policy to which this chapter applies issued by an insurer, if the insurer becomes an insolvent insurer on or after July 1, 1988." Despite this clear statutory language imposing upon the fund a duty to compromise and settle claims, the fund maintained at oral argument that it was not required to participate in settlement negotiations, and indeed that it could not involve itself in any attempts to settle the claim made against it.

■ In *Medical Malpractice,* we held that the act "imposes upon the fund the duty to protect the interests of its insured in the same manner as would be required of a solvent insurer. *** [A]n insurer has a duty to act in the best interests of its insured in order to protect the insured from excess liability." 703 A.2d at 1102. Accordingly, we conclude that the fund owes its insureds an equivalent duty to participate in settlement negotiations, and in so doing protect insureds from excess liability.

The Peltiers indicated at oral argument that they had offered previously to release their claims against Benoit and his insurer in exchange for payment of the American Universal $25,000 policy limit. Thus, the Peltiers, having collected $50,000 in uninsured motorist coverage from their own insurer, John Hancock, would have settled for a total of $75,000 even though that amount was less than the $100,000 minimum recovery for liability if they succeeded in a wrongful death action. If the fund had acted in furtherance of its statutory responsibility to prevent "financial loss to claimants or policyholders because of the insolvency of an insurer," § 27–34–2, it would have considered this offer to settle. The fund might well have concluded that the offer was reasonable in light of the statutory minimum recovery for wrongful death. Had the fund paid the $25,000 at that time, it would have protected Benoit from his putative liability at any future trial. We have pointed out that "an insurer must refrain from acts that demonstrate greater con-

cern for the insurer's monetary interest than the financial risk attendant to the insured's situation." *Medical Malpractice,* 703 A.2d at 1102. By refusing to participate in settlement negotiations, the fund subjected its insured, Benoit, "to the possibility of significant excess liability." *Id.*

The fund alleged, however, that its refusal to work towards settling claims was in the public interest because, in the long run, the fewer claims it pays, the less money it must assess against insurers, thereby resulting in lower rates for insureds statewide. Thus, the fund argued, it was preserving public resources by so acting. We reject this argument. The position the fund has taken would render it unassailable under its unreasonable assertion that whenever there is an alternate source of insurance of any amount, the fund is, in effect, absolved of liability for a covered claim. Such a posture does not serve the public interest. Substantial funds are spent litigating claims that could and should have been settled. Had the fund paid the $25,000 policy limits to the Peltiers, every claim in this case arguably could have been extinguished. Rigid refusal to negotiate confers no benefit on the public.[4]

In conclusion, we hold that the act required the fund to pay the Peltiers up to the $25,000 limits on Benoit's American Universal policy in payment of any judgment obtained against Benoit in excess of $50,000. Under the act, the fund inherits the obligations of the insolvent insurer and thus must protect insureds when an insolvent company is unable to do so. The entry of a summary judgment in favor of the fund was error. Therefore, the appeal is sustained. We vacate the judgment of the Superior Court, and remand this case for further proceedings.

---

4. By refusing to defend Benoit, the fund may have exposed itself inadvertently to liability in excess of the $25,000 policy limits, possibly even to the act's $300,000 limitation.