DECISION
Before this Court are motions for summary judgment, brought pursuant to Super. R. Civ. P. Rule 56, which raise nearly identical issues in the three above-captioned cases. The Massachusetts Insurers Insolvency Fund (Mass. Fund or Plaintiff) seeks a declaratory judgment in order to determine its liability, if any, to pay claims arising out of three automobile accidents which occurred in Rhode Island between 1998 and 2000. The Court has jurisdiction of these matters pursuant to the Uniform Declaratory Judgments Act, G.L. 1956 §§ 9-30-1 to 9-30-16.
 Facts/Travel
Plaintiff's claims involve the following groups of interested persons. The first group of Defendants, Lana M. Mulrath (C.A. No. 02-6524), Celeste Martins (C.A. No. 02-4764), and Joanne Burke (C.A. No. 02-6983) are Rhode Island residents who suffered harm as a result of automobile accidents, and are collectively referred to in this decision as "Claimant." Those injuries were the result of the alleged negligence of the second group of Defendants, Adam G. Lambert (C.A. No. 02-6524), David P. Weremay (C.A. No. 02-4764), and Manuel Teixeira (C.A. No. 02-6983), all Massachusetts residents who are collectively referred to in this decision as "Tortfeasor." Finally, the last group of interested persons consists of insurance companies which provided uninsured motorist (UM) coverage to Claimant: Allstate (C.A. No. 02-4764 and 02-6983) and Metropolitan Property and Casualty Insurance Company (C.A. No. 02-6524).[1] These insurers will be collectively referred to as "UMCo" in this decision.
The pertinent facts in this case appear to be undisputed. An automobile accident occurred in Rhode Island between Claimant and Tortfeasor. Claimant allegedly suffered personal injuries as a result of Tortfeasor's negligence. Claimant's damages are unclear on the record, but in all cases the damages allegedly exceed the amount of Claimant's UM policy limits. At the time of the accident, Tortfeasor was a resident of Massachusetts and was insured under an automobile liability policy issued by Trust Insurance Company (Trust). Under that policy, Trust agreed to insure Tortfeasor for damages for which he was legally responsible up to the limits of coverage stated in the insurance policy.[2]
On August 2, 2000, Trust was found to be insolvent by a court of competent jurisdiction in Massachusetts. As a result of Trust's insolvency, the Mass. Fund became obligated to pay "covered claims" arising out of certain Trust policies as provided by Mass. Gen. Laws c. 175D, §§ 1-16. Rhode Island has a similar statute, the Rhode Island Insurers' Insolvency Fund Act, G.L. 1956 §§ 27-34-1 to 27-34-19, which created the Rhode Island Insurers Insolvency Fund (R.I. Fund). Both funds were created in order to pay certain obligations of many types of insolvent insurers including automobile insurers. See G.L. 1956 §§ 27-34-2 to 27-34-3; Mass. Gen. Laws c. 175D, §§ 1-2. Since Trust was licensed in Massachusetts and not in Rhode Island, the Mass. Fund undertook Trust's obligations, and the R.I. Fund is not a party to this suit. See G.L. 1956 § 27-34-5(10) (noting that, an insurer must be licensed within the state to qualify as a "member insurer" and to be an "insolvent insurer" for purposes of the statute).
Claimant was a resident of Rhode Island at the time of the accident, and was insured under an UM policy issued by UMCo. That policy provided Claimant with coverage for damages caused by uninsured motorists, including those motorists whose insurer becomes insolvent,[3] up to limits stated in the policy.[4] UMCo has paid to Claimant an amount equal to her UM policy limit as a result of the automobile accident and Trust's insolvency.
The Mass. Fund seeks a declaration that any liability to Claimant on a covered claim resulting from Trust's insolvency should be offset by amounts that Claimant recovers from her UM policy. It also seeks a declaration that Claimant may not recover from Tortfeasor except to the extent that her claims exceed amounts already recovered from her UM policy. Claimant and Tortfeasor have both objected to the motion for summary judgment.
 Standard of Review
Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as matter of law." Super. R. Civ. P. Rule 56(c). "If there are no material facts in dispute, the case is ripe for summary judgment." Richard v. Blue Cross BlueShield, 604 A.2d 1260, 1261 (R.I. 1992).
 Analysis
The Court will first examine the background of the model statute which formed the basis for both the Mass. Fund and R.I. Fund, and how each state's enactment has been interpreted. It will then determine which state's law is applicable, and then apply that law to determine whether or not UM insurance must be offset against the Mass. Fund's liability. Finally, the Court will examine Claimant's rights against Tortfeasor following the insolvency of Trust, Tortfeasor's liability insurer.
Background of Insurers Insolvency Funds
In 1969, the National Association of Insurance Commissioners drafted a model act — adopted in different forms by both Massachusetts and Rhode Island — which governs insurers' insolvency funds. See Post-Assessment Property and Liability Insurance Guaranty Association Model Act at www.lexis.com, 3 NAIC Model Laws, Regulations and Guidelines 540-1, Legislative History (Nat'l Ass'n of Ins. Comm'rs, April, 2006) (hereinafter NAIC Model Act). The purpose of the act is to
 "provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment and to the extent provided in this Act minimize financial loss to claimants or policyholders because of the insolvency of an insurer, and to provide an association to assess the cost of such protection among insurers." Id. § 2; see G.L. 1956 § 27-34-2 (containing a similar provision, but stating that the purpose is to "avoid financial loss" as opposed to merely minimizing loss to the extent provided in the act).[5]
These purposes are achieved by assessments on liability carriers which do business in states which have enacted the NAIC Model Act. NAIC Model Act § 8(3). The insurers, in turn, pass the costs of the insolvency fund onto their insureds through higher premiums. See id. § 16.
When an insurer becomes insolvent, the Act provides that a state's insolvency fund is only obligated to pay "covered claims." Id. § 8(A)(1)(a). A covered claim is defined as
 "an unpaid claim, including one for unearned premiums, submitted by a claimant, which arises out of and is within the coverage and is subject to the applicable limits of an insurance policy to which this Act applies issued by an insurer, if the insurer becomes an insolvent insurer after the effective date of this Act." Id. § 5(F).[6]
Therefore, a covered claim is one which is within the coverage of a policy issued by an insurer if the insurer becomes insolvent. A covered claim does not include, however, any "amount due any reinsurer, insurer, insurance pool or underwriting association as subrogation recoveries, reinsurance recoveries, contribution, indemnification or otherwise." Id. § 5(F)(3)(c). In this way, some protection is provided to claimants and policyholders from an insurer's insolvency, but other members of the insurance industry do not benefit from the insolvency fund.
The provision of the Act that is central to the dispute at bar is titled "Exhaustion of Other Coverage" in the NAIC Model Act.Id. § 12. Prior to 1996, this section was called "Nonduplication of recovery," but the NAIC Model Act changed the name "to better reflect the intent of the section." Id.,
Legislative History.[7] For convenience, the Court will refer to provisions of this type as "exhaustion provisions." The Model Act's exhaustion provision has been modified over the years, but now states that
 "[a]ny person having a claim against an insurer whether or not the insurer is a member insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his or her right under the policy. An amount payable on a covered claim under this Act shall be reduced by the amount of recovery under the insurance policy. Id.
§ 12.
Therefore, when an insured or claimant asserts a claim against an insolvency fund, the claim is offset by recoveries obtained from other sources. While both the Massachusetts and Rhode Island exhaustion provisions derive from the same source, Plaintiff and Defendants have contrasting views — which correspond to the contrasting views expressed by the high courts in Massachusetts and Rhode Island, respectively — over how the exhaustion provision applies.
The Exhaustion Provisions in Rhode Island and Massachusetts
The leading case interpreting Rhode Island's exhaustion provision is Rhode Island Insurers Insolvency Fund v. Benoit,723 A.2d 303 (R.I. 1999). In that case, the facts were similar to the facts in the cases at bar. In Benoit, the victim of a car accident, who possessed a $50,000 UM policy, suffered harm as a result of the alleged negligence of a tortfeasor, who had only $25,000 of liability insurance. Id. at 304 The damages were not quantified, but they exceeded $100,000. Id. at 308. The liability insurer subsequently became insolvent.
The victim brought two claims: one against his own insurer for the $50,000 UM coverage,[8] and one claim against the R.I. Fund for $25,000 as a covered claim resulting from the insolvency of the tortfeasor's liability insurer. Id. at 306. Consequently, the R.I. Fund brought a declaratory judgment action, similar to the cases at bar, arguing that it had no liability to the victim's estate because the estate had recovered under her UM policy, and that the UM recovery must be offset against the R.I. Fund's liability. See id. at 305.[9]
Because the $50,000 UM policy exceeded the limits of the $25,000 liability policy, the R.I. Fund argued that it had no liability.Id. at 306.
The Court looked to the Rhode Island Act's exhaustion provision, which states that
 "[a]ny person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his or her right under that policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under the insurance policy." § 27-34-12(a) (emphasis added).
The Court found that since the victim's UM claim was asserted against its own insurer, and not the insolvent insurer, it fell outside the definition of covered claim. Id. at 307; see G.L. 1956 § 27-34-5(8) (defining covered claim as one arising from the policy of an insolvent insurer). Therefore, since only covered claims must be offset, the UM recovery should not be offset against the R.I. Fund's liability. Id.
As a result, the victim's estate received the following amounts towards her damages, which exceeded $100,000: a $50,000 recovery from her own UM policy; and $25,000 as a covered claim from the R.I. Fund. Id. at 308. The Court noted that this result furthered the policy of the provision — to avoid duplicate recoveries — because the victim's estate did not receive more than she would have received if the liability insurer had not become insolvent. Id.[10] Therefore, the R.I. Fund could not "offset an amount due from an insolvent insurer in the event a claimant has not received full compensation for damages." Id.
Therefore, the rule in Rhode Island is that the R.I. Fund's liability to pay covered claims will be offset by amounts received from UM policies only to the extent that it would result in a victim receiving more than the amount of her damages.[11] Otherwise, the R.I. Fund is not entitled to an offset, and must pay as much as is necessary to make the victim whole, after accounting for UM recoveries, up to the stated limits of the liability policy.
In a case similar to Benoit, the Supreme Judicial Court of Massachusetts has expressed a different view on its own exhaustion provision. See Vokey v. Massachusetts InsurersInsolvency Fund, 409 N.E.2d 783 (Mass. 1980). The two victims in the Massachusetts case, a husband and wife, suffered approximately $23,000 in damages. Id. at 784. The victims were paid $10,000 from their UM policy, and the tortfeasor had $10,000 of liability coverage. Id. at 784.[12] The victims sought recovery from the Mass. Fund for the remainder of their damages, up to the tortfeasor's policy limits. Id. at 785. Like the R.I. Fund in Benoit, the Mass. Fund sought to offset the UM recovery against its own liability on the covered claim arising from the tortfeasor's liability policy.
The Supreme Judicial Court denied the victim's claims even though he still had unpaid damages. The Massachusetts provision states that:
 "[a]ny person having a claim against his insurer under any insolvency provision in his insurance policy which is also a covered claim shall be required to exhaust first his right under such policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of such recovery under the claimant's insurance policy." Mass. Gen. Laws, c. 175D, § 9 (emphasis added).
The court found that "the purpose of the exhaustion requirement of the first sentence of § 9 is to render the [Mass.] Fund a source of last resort in the event of insolvency." Vokey,409 N.E.2d at 786. "[A]ny recovery to which a claimant is contractually entitled under his own insurance policy shall be offset to reduce the liability of the [Mass.] Fund." Id. The court also remarked in a footnote that a recovery from the fund would place Vokey in a better position than if the tortfeasor's liability insurer had not become insolvent, because he could only have recovered $5,000 per person and $10,000 per accident from the insolvent insurer, but he had already recovered $10,000 because of the insolvency.[13]
The court held that the exhaustion provision required that UM recoveries be offset against the Mass. Fund's liability on covered claims. See id. at 785-86. Therefore, the Massachusetts rule is that the insolvency fund will pay only so much as is necessary for the victim to receive — from all insurance sources — the amount that he or she would have received under the tortfeasor's liability insurance policy.[14] If the UM coverage is greater than or equal to the tortfeasor's liability coverage, the Mass. Fund has no liability, and the only way for a victim to obtain a recovery greater than the tortfeasor's liability policy is to have UM coverage that exceeds those liability limits.[15]
That two similar enactments of the same model provision can be interpreted in such contrasting ways demonstrates that the provision was "neither a model of clarity nor an exemplar of the draftsman's craft." Benoit, 723 A.2d at 307 (citing Az. Prop. Cas. Ins. Guar. Fund v. Herder, 751 P.2d 519, 523 (Ariz. 1988)). However, the divergent views are merely the result of two jurisdictions reaching different resolutions of a difficult policy choice. As a matter of policy, either the Rhode Island or the Massachusetts interpretation is reasonable. By right, the insolvent insurer should have to pay the claims arising from its insurance policies, but of course the insolvency makes this impossible, so the question becomes one of loss distribution.
Under the Rhode Island interpretation, claimants and policyholders will bear less of the harm from automobile accidents when an insurer becomes insolvent because there will be a greater pool of funds from which to recover. To cover his or her damages, the claimant can recover the limit of his UM policy from his own insurer, and, if necessary, the limit of the tortfeasor's liability policy from the insolvency fund. Conversely, under the Massachusetts rule, there will be less insurance available — between UM coverage and the insolvency fund — to compensate claimants. The claimant's total recovery from insurance sources is limited to the tortfeasor's liability policy limit, or his own UM limit if it happens to be higher, but not the sum of both as in Rhode Island. Therefore, a greater part of the losses will fall either to the tortfeasor — who will be liable on the amounts in excess of his liability policy — or if he is judgment-proof, the claimant will bear the loss. So if the purpose of an insolvency fund is to "minimize" or "avoid financial loss to claimants and policyholders," the Rhode Island rule better accomplishes that goal. See G.L. 1956 § 27-34-2; NAIC Model Act § 2.
That protection has a cost, however. Under the Rhode Island rule, the insolvency fund will pay more claims, and therefore, charge higher assessments to its member insurers whose customers will pay higher premiums for liability insurance. Conversely, under the Massachusetts rule, the fund will pay fewer claims, charge less to its member insurers, and their customers should pay less in insurance premiums. The Massachusetts legislature is entitled to decide the extent of losses it will insure and which it will leave for tortfeasors and their victims to bear because it was never required to create an insolvency fund in the first place. See Vokey, 409 N.E.2d at 786 (describing the Mass. Fund as a "source of last resort").
Choice of Law Issues as to the Mass. Fund's Liability
It is clear that the law in Rhode Island and in Massachusetts is well-settled in opposite directions. The high courts in the respective states have concluded that their legislatures intended different results when they enacted slightly different versions of the exhaustion provisions. Therefore, this Court must decide which jurisdiction's law to apply to the cases at bar.
Rhode Island choice of law rules seek to apply the law of the forum with the most significant interest in having its law applied. See, e.g., Blais v. Aetna Casualty Sur. Co.,526 A.2d 854, 856 (R.I. 1987) Although Defendants seek to apply Rhode Island law — specifically the Benoit decision — to the case at bar, there is no basis to do so. The Mass. Fund is not an insurer whose contract for insurance is at issue in this case. The Mass. Fund's liability to pay claims to Claimant, if there exists any, arises only by reason of the Massachusetts statute. See Mass. Gen. Laws c. 175D § 5(1)(a) (obligating the Mass. Fund to pay covered claims against insolvent insurers). Therefore, even if the Court assumes arguendo that Rhode Island law applies to the underlying tort claims between Claimant and Tortfeasor, the Mass. Fund's liability must be governed by the interpretation by the Massachusetts high court of the Massachusetts statute.
It would be an absurd result if the Mass. Fund, an association created by Massachusetts statute, which is funded by Massachusetts insurers who write policies covering Massachusetts motorists and whose obligation to pay arises from a Massachusetts statute, should have that statute interpreted according to Rhode Island case law. As our Supreme Court noted, it would be improper to try to interpret Massachusetts law using the precedents of Rhode Island:
 "When we are presented with an issue to be governed by foreign law, we . . . should have for our purpose the giving of just effectuation to the rights and obligations created by the laws of the appropriate locus. . . . Our aim should be to incorporate the law of the locus into our decision so as to homologize fairly any and all claims and defenses which each party would enjoy under the laws of the governing jurisdiction. In short, we should examine the laws of the locus and, using them as a model, seek to achieve the same result as would likely be reached by its courts. . . . In so doing, we are recognizing
and satisfying, whenever possible, the expectancies of the parties as well as protecting innocent litigants from having their legal rights and claims, valid under the laws of one forum, from being disfranchised. . . ." Clougherty v. Royal Ins. Co., 102 R.I. 636, 649-50, 232 A.2d 610, 617 (1967) (Kelleher, J., concurring) (emphasis added).
The Mass. Fund is an association which relied on the fact that its obligations were governed by Massachusetts law, as interpreted by Vokey, in order to determine the extent of its potential liabilities, and therefore, how much to assess its member insurers. If the Court adopted the Rhode Island interpretation of the exhaustion provision, it would dramatically increase the Mass. Fund's potential liability beyond that which it expected or for which it is prepared to bear.[16] TheBenoit decision was a decision of the Rhode Island Supreme Court, which interpreted a Rhode Island statute. Therefore, even if the statutes are in many ways similar, Benoit cannot control the obligations of the Mass. Fund. Accordingly, the Court finds that Massachusetts law applies to the obligations of the Mass. Fund to pay claims, and the principles of Vokey, described above, are controlling. See 409 N.E.2d at 785-86.
Application of Massachusetts Law as to the Liability of theMassachusetts Fund
As noted above, the law in Massachusetts after Vokey is that UM recoveries must be offset against the Mass. fund's liability to pay covered claims. 409 N.E.2d at 785-86. Defendants argue, however, that offsetting the Mass. Fund's liability by amounts received under Claimant's UM policy would leave them in a worse position than if Trust had remained solvent, and consequently, no set-off should be required even under Vokey.
It is true that Claimant will be worse off as a result of any offset because, unlike the Plaintiff in Vokey, her Rhode Islanduninsured motorist polices also include underinsured motorist coverage, while in Massachusetts underinsured coverage is optional.[17] See 409 N.E.2d at 785 n. 4. For example, in the case of Mulrath and Lambert, C.A. No. 02-6524, Mulrath had a $100,000 uninsured/underinsured motorist policy, and Lambert had $100,000 in liability coverage. Assuming arguendo that she suffered $250,000 damages and Trust had remained solvent, Mulrath could have recovered $100,000 each from Trust and from her UM insurer for a total of $200,000. However, now that Trust has become insolvent, she can still recover $100,000 from her UM policy, but if the UM recovery is offset against the Mass. Fund's liability, there will be no further recovery.[18]
While the Court acknowledges that Claimant is worse off as a result of the insolvency, Massachusetts has not made this the determining factor as to whether other recoveries are offset against the Mass. Fund's liability. The determining factor is whether she has obtained "any recovery to which a claimant is contractually entitled under [his or her] own insurance policy."[19] Vokey, 409 N.E.2d at 786. Massachusetts has a right to determine the extent to which it will pay as a result of an insurer's insolvency, and it has decided by statute to limit its payments to Claimant. Thus, a claimant's only remedy under the Massachusetts rule is to have protected herself with greater UM coverage. While hindsight is of little comfort, the result is no worse than if Claimant had been harmed by a driver with no insurance at all — a risk that all motorists must bear.
Defendants also argue that a UM claim against Claimant's insurer is not a "covered claim" within the meaning of the Massachusetts exhaustion provision. This was the argument that prevailed in Benoit: that only covered claims could offset the insolvency fund's liability, and since UM claims were not asserted against insolvent insurers, such claims should not be offset. See 723 A.2d at 307. The Defendants' reliance onBenoit is misplaced, however, because it is not the law in Massachusetts. Although it did not specifically consider whether UM claims were covered claims, by finding that the claim for UM benefits should be offset against the Mass. Fund's liability, the Supreme Judicial Court implicitly rejected any argument that UM claims could not be covered claims because the UM claims were not asserted against an insolvent insurer. See Vokey,409 N.E.2d at 785-86. Mass. Gen. Laws ch. 175D § 1(2); compare Benoit,723 A.2d at 307 (finding that claims under UM policies were not covered claims subject to the exhaustion provision because they were not asserted against an insolvent insurer).
Massachusetts seems to have written the phrase, "which is a covered claim," out of its exhaustion provision, instead focusing on the phrase "any insolvency provision in his insurance policy" to conclude that the provision requires the offset of UM recoveries. Id. § 9.[20] As so interpreted, the statute could be read as follows: any person having a claim against his insurer under any insolvency provision in his insurance policy which arises out of the same incident as a covered claim shall be required to exhaust first his right under such policy. Therefore, Massachusetts rejected this argument in Vokey,
albeit implicitly, that claims under UM policies are not covered claims when it held that UM claims should be offset against the Mass. Fund's liability. See Vokey, 409 N.E.2d at 785-86. The holding in Vokey appears to have been consistently followed in Massachusetts, see e.g. Ulwick v. Massachusetts InsurersInsolvency Fund, 637 N.E.2d 209, 210 (Mass. 1994);Massachusetts Insurers Insolvency Fund v. DeFeudis, No. 92-PB-1623, slip. op. at 3-4 (Mass.Ct.App. Feb. 2, 1994), and Defendants have not cited any cases that find otherwise.[21] Therefore, this Court finds that under Massachusetts law, any UM recovery must be offset against the Mass. Fund's liability on covered claims under the rule established in Vokey. See 409 N.E.2d at 785-86.
The Vokey decision appears unsatisfactory because it applies a strained interpretation to the exhaustion provision. However, with regards to statutory interpretation, the Benoit approach is also imperfect as well. It is rare, if not impossible, for a person to have a claim against his own UM insurer which is also a claim against the insolvent liability insurer — even if they arise from the same incident, they are separate claims against separate parties. Therefore, by holding that only claims which are also covered claims offset the insolvency fund's liability, our Court seems effectively to have written the entire exhaustion provision out of the statute.
The Court gives effect to the exhaustion provision by saying that it applies only to prevent a duplicative recovery. Benoit,723 A.2d at 307. Thus, when the sum of a claimant's UM coverage and the tortfeasor's liability coverage is greater than the claimant's damages, a setoff will be allowed — perhaps only a partial setoff so that the claimant will recover no more than the amount of his or her damages. However, this result would likely be reached even in the absence of an exhaustion provision.[22] While the Benoit interpretation may better fulfill the purposes of the insolvency fund statute, its statutory interpretation is not immune to criticism. Again, while neither statute is a model of clarity, id. at 307, nor is either decision immune to criticism as a result, both states have adopted reasonable approaches to a difficult policy choice.
Extent of Tortfeasor's Liability Following the Insolvency of HisInsurer
In addition to limiting its own liability, the Mass. Fund seeks a declaration that Tortfeasor has no liability to Claimant except to the extent that Claimant's damages exceed the amounts recovered through Claimant's UM policy. It argues that since the Massachusetts Act was designed to protect insured persons whose insurers become insolvent, Claimant should not be able to recover against Tortfeasor except to the extent that her damages exceed Tortfeasor's policy limit. In support of this proposition, the Mass. Fund cites a Superior Court case from Pennsylvania. SeePanea v. Isdaner, 773 A.2d 782, 791 (Pa.Super.Ct. 2001). While it not clear which state's law would apply to the issue of Tortfeasor's liability to Claimant, both the Massachusetts and Rhode Island legislatures have expressed the intent that an insured should not suffer harm as a result of his insurer's insolvency. See G.L. 1956 § 37-34-5(8)(ii)(C); Mass. Gen. Laws c. 175D, § 1(2).[23] Therefore, the Court finds that either state's law would produce the same result.
Under the Massachusetts rule, Claimant's UM insurer has taken the place of Tortfeasor's insolvent liability insurer up to the extent of the UM policy limits. See Panea, 773 A.2d at 791
(noting that the loss occasioned by offsetting the insolvency fund's liability falls not to the claimant, but to the solvent insurers who paid the claimant's claims under other forms of insurance). Then, if Claimant's UM policy limits are less than Tortfeasor's liability limits, the Mass. Fund will pay as a covered claim the difference between Claimant's UM policy limits and Tortfeasor's liability limits. However, if the limits of the UM policy are greater than or equal to Tortfeasor's liability limits, then the Mass. Fund has no covered claim liability.[24] In either case though, the Claimant will receive an amount equal to Tortfeasor's liability limit from a combination of its own UM insurer, and if necessary, the Mass. Fund. So up to the limits of the liability policy, Claimant would normally have no claim against Tortfeasor — any claim up to the amount of the policy is actually UMCo's claim for subrogation against Tortfeasor.
Claimant argues, however, that UMCo has waived its right to seek subrogation and has assigned its claim against Tortfeasor to Claimant.[25] Claimant now seeks to assert that claim against Tortfeasor. The Mass. Fund argues here that the Claimant should not be able to seek recourse against Tortfeasor on this subrogation claim because Tortfeasor's liability only resulted from his own insurer's insolvency; without the insolvency, the Tortfeasor would have been protected up to the limit of his liability policy. See Panea, 773 A.2d at 791. Therefore, allowing a claim against the insured motorist, whom the Mass. Fund was intended to protect, would contravene the legislative intent of the insolvency fund statute. See id. at 791; Mass. Gen. Laws c. 175D § 1(2); see also G.L. 1956 §27-34-8(ii)(C), § 27-34-2 (noting that the purpose of the R.I. Fund is also to protect claimants and policyholders against loss arising from an insurer's insolvency).
While the Court sympathizes with the Claimant, whose damages allegedly exceed the amount of insurance available, the Court finds that the Mass. Fund has the better argument. Any claim that Claimant has up to the amount of Tortfeasor's liability policy is actually the subrogation claim of UMCo against Tortfeasor, gratuitously assigned to Claimant, because Claimant has already been paid on the UM policy. The legislatures of both Rhode Island and Massachusetts have expressed the intent that members of the insurance industry must bear some of the loss arising from insolvency, and may not recover from the insured. See G.L. 1956 § 37-34-8(ii)(C); Mass. Gen. Laws c. 175D, § 1(2). Therefore, UMCo could not have asserted its subrogation claim against Tortfeasor, under the rule expressed in Panea, regardless of whether Rhode Island or Massachusetts law is applied. Because the claim was valueless to UMCo, Claimant may not assert that claim against Tortfeasor merely because UMCo assigned it to Claimant.
This result makes sense because even though the automobile accident was allegedly Tortfeasor's fault, the insolvency of his liability insurer was not his fault, and he should be able to enjoy the benefit that he purchased with his insurance premiums. Claimant has been compensated by her UM policy at least to the amount of Tortfeasor's liability policy, if not more. Further, Claimant has a remaining claim against Tortfeasor for the excess damages above the liability policy amount. If any injustice can be said to result from this rule, it is that Rhode Island UM insurers, who would normally have subrogation claims against the tortfeasors, are barred from asserting those claims. SeePanea, 773 A.2d at 791. However, this merely reflects the policy that when an insurer becomes insolvent, other insurers are required to bear part of the loss, and that the insolvency fund will only pay its funds to policyholders and claimants who suffer harm from the insolvency, not to other members of the insurance industry. See Mass. Gen. Laws c. 175D § 1(2); §27-34-5(8)(ii)(C). Moreover, insurers comprehend when writing UM policies that any subrogation claim they acquire may be valueless, because it could be asserted against a judgment-proof tortfeasor. Such losses are built into the cost of UM policies, so any injustice is minimal. Therefore, the Court finds that Claimant has no claim against Tortfeasor except to the extent that her damages exceed the amount of the Tortfeasor's liability policy.[26]
 Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court grants Plaintiff's motion for summary judgment. The Court will enter a declaration that any liability of the Massachusetts Insurers Insolvency Fund's obligation to Claimant on any covered claim will be reduced by amounts recovered by Claimant through her UM policy. For the reasons contained herein, the Court will also enter a declaration that Claimant may not recover against Tortfeasor except to the extent that Claimant's damages exceed the amount of Tortfeasor's liability policy with Trust.
Based upon the above principles, the Court finds that in Mass.Fund v. Lambert, Mulrath, and Metropolitan Property and CasualtyInsurance Co., C.A. No. PB 02-6524, Defendant Mulrath has recovered $100,000 from her UM policy. Defendant Lambert's liability policy with the insolvent Trust Company was limited to $100,000 per person. Therefore, Mulrath's UM recovery is offset against the Mass. Fund's $100,000 covered claim liability, and the Mass. Fund has no further liability to Mulrath. Mulrath has a claim against Lambert for excess damages to the extent that her damages exceed $100,000. However, Lambert is not subject to any subrogation claim that Metropolitan or Mulrath may have for the $100,000 paid by Metropolitan.
In Mass. Fund v. Weremay and Martins, C.A. No. PB 02-4764, Defendant Martins has received $100,000 from her UM policy. Defendant Weremay's liability policy with the insolvent Trust Company had limits of either $20,000 or $25,000 per person.[27] For the reasons described above, the Mass. Fund's covered claim liability of at most $25,000 is offset by Martins' recovery from her UM policy. Therefore, the Mass. Fund has no further liability to Martins. For the reasons described above, Weremay is not subject to any claim for subrogation for the first $20,000 or $25,000 of the amount paid by Allstate to Martins. However, Weremay remains subject to any subrogation claim that Martins or Allstate may have for the remaining $75,000 or $80,000 paid by Allstate. Martins also has a claim against Weremay to the extent that her damages exceed the $100,000 that she has recovered from her UM policy.
In Mass. Fund v. Teixeira and Burke, C.A. No. PB 02-6983, Defendant Burke has $25,000 of UM coverage. Defendant Teixeira's liability policy with the insolvent Trust Company had limits of $100,000 per person. For the reasons described above, the Mass. Fund's covered claim liability, which is at most $100,000, is offset by Burke's $25,000 UM policy. Therefore, the Mass. Fund's liability is equal to the amount of damages incurred by Burke, up to $100,000, less $25,000. Teixeira is not subject to any subrogation claim that Burke or Allstate may have against Teixeira for $25,000. Because Teixeira had liability coverage of $100,000 per person, Burke may recover from Teixeira to the extent that Burke's damages exceed $100,000.
Prevailing counsel may present an order and judgment consistent herewith which shall enter upon notice to all other counsel of record.
[1] Allstate was not a party to either of the two actions involving its insured. Metropolitan was a party in the relevant case, but has settled its claims with the Plaintiff.
[2] Teixeira (02-6983) and Lambert (02-6524) both had limits of $100,000 per person under their liability policies. The record is unclear as to whether Weremay (02-4764) had a limit of $20,000 or $25,000 per person, but the Court can render a decision without clarification of this issue.
[3] The content of UM policies is governed by G.L. 1956 §27-7-2.1(a), which requires that UM policies cover harm caused by motorists whose insurers become insolvent. Massachusetts has a similar requirement. See Mass. Gen. Laws c. 175, § 113L(a).
[4] Martins (02-4764) and Mulrath (02-6524) each had UM policy limits of $100,000 per person, while Burke (02-6983) had a $25,000 per person limit.
[5] Massachusetts has no analogous statement of purpose in its act.
[6] Rhode Island and Massachusetts have definitions of "covered claim," which are identical in all material respects to the Model Act definition and to each other. Cf. G.L. 1956 § 27-34-5(8); Mass. Gen. Laws c. 175D, § 8(2).
[7] Rhode Island retains the former title for this section. G.L. 1956 §§ 27-34-12. Massachusetts refers to this section in the code as "Exhaustion of policy insolvency provisions on covered claims; reduction of recovery on policy from amount payable under this chapter; multiple funds." Mass. Gen. Laws c.175D § 9.
[8] As noted above, insolvencies usually trigger claims for uninsured motorist benefits. See G.L. 1956 § 27-7-2.1(a); Mass. Gen. Laws c. 175, § 113L(a).
[9] The R.I. Fund also sought a declaration, similar to that sought by Plaintiff, that the tortfeasor was shielded from liability to the extent that his insurer would have paid the victim's estate if it had not become insolvent. See Benoit,723 A.2d at 305. The Supreme Court did not reach that issue.
[10] Had the tortfeasor's insurer not become insolvent, the victim would have been able to recover $25,000 from the tortfeasor's liability insurer and $50,000 of underinsured motorist coverage for a total of $75,000. So because the victim had underinsured motorist coverage, the Supreme Court's decision placed the victim in the same position as if there had been no insolvency. In Rhode Island, uninsured motorist coverage includes underinsured motorist coverage. In Massachusetts, however, while uninsured motorist coverage is mandatory, underinsured motorist coverage is optional. See
Mass. Gen. Laws c. 175, 113L(2).
[11] Other courts that have ruled similarly include Pennsylvania and Louisiana, but both decisions have been superseded by statute. See Sands v. Pennsylvania Ins. GuarantyAssoc., 283 Pa. Super. 217, 224 (Pa.Super.Ct. 1980)superseded by statute in Ind. Ins. Guar. Ass'n v.Blickensderfer, 778 N.E.2d 439, 443 n. 3 (Ind.Ct.App. 2002);Billeaudeau v. Lemoine, 386 So. 2d 1359, 1361 (La. 1980)superseded by 1990 La. Acts No. 130.
[12] The Court has simplified the facts slightly. The victims were both a husband and his wife. Vokey, 409 N.E.2d at 784. Although the couple's UM coverage provided $20,000 per accident, the wife obtained no recovery from the UM policy. Id. The tortfeasor's liability insurance was limited to $10,000 per accident. Id. Therefore, offsetting the husband's $10,000 recovery would reduce the Mass. Fund's liability to zero. Id.
at 785.
[13] Presumably, Vokey did not have underinsured motorist coverage, or he could have recovered more than merely the limits of the tortfeasor's liability policy.
[14] In contrast, under the Rhode Island rule, the victims could recover another $10,000 from the insolvency fund for a total recovery of $20,000. Because they still had not been made whole, no offset would be allowed.
[15] For other jurisdictions reaching similar conclusions,see Caroll J. Miller, Validity, Construction, and Effect ofStatute Establishing Compensation for Claims Not Paid Because ofInsurer's Insolvency, 30 A.L.R. 4th 1110, § 8(b) (2005) (collecting cases).
[16] The potential increase in the Mass. Fund's liability would be even greater if one considers the possibility that New Hampshire, Vermont, New York, and Connecticut could each apply inconsistent interpretations to the Massachusetts exhaustion provision for accidents occurring in those adjacent states. That liability should not be increased simply because the accident happened to occur between a Rhode Island claimant and a Massachusetts tortfeasor. The Mass. Fund must be able to rely on the pronouncements of the Massachusetts courts in interpreting a Massachusetts statute.
[17] See Mass. Gen. Laws c. 175 § 113L(2).
[18] If Mulrath were a Massachusetts resident who declined the optional underinsured motorist coverage, then she would be indifferent to Trust's insolvency, because she would recover either $100,000 from Trust if it was solvent, or otherwise $100,000 from a combination of her UM insurer and the Mass. Fund.
[19] In Massachusetts, if the claimant does not haveunderinsured motorist coverage, then offsetting UM recoveries against the Mass. Fund's liability does place the claimant in the same position he or she would have enjoyed without the insolvency. See Vokey, 409 N.E.2d at 785-86.
[20] Note that Rhode Island's statute does not refer to the other insurance policy with a possessive pronoun, but rather refers to "any" provision in an insurance policy. See G.L. 1956 § 27-34-12(a).
[21] Defendants rely on two Massachusetts cases to argue that Claimant's UM recoveries should not offset the Mass. Fund's liability, but these cases are distinguishable. In Ulwick,637 N.E.2d at 210-11, the Mass. Fund could not offset its liability on a covered claim by disability payments received by claimant from his employer, the City of Melrose. In MassachusettsInsurers Insolvency Fund v. Ladd, 658 N.E.2d 696 (Mass. 1995), the Court found similarly that payments from a health plan and social security did not offset the Mass. Fund's liability. The Court found claimant's claims were covered claims because that they were "unpaid" within the meaning of the statute, and because the City was not an "insurer" for whom the payments would benefit in violation of the statute. Neither case involved offsetting UM recoveries nor addressed the exhaustion provision.
[22] If the victim's total recovery from the R.I. Fund and her UM insurer resulted in a recovery exceeding her damages, then some of the recovery from the R.I. Fund would inure to the benefit of the UM insurer who would be entitled to reimbursement. This contravenes a central premise of the insolvency fund that its payments should not benefit members of the insurance industry. See G.L. 1956 § 27-34-5(8)(ii)(C); Mass. Gen. Laws c.175D, § 1(2). For example, assume that the victim's damages are $100,000, the victim's uninsured motorist coverage is $50,000, and the tortfeasor's liability insurance is $75,000. The Rhode Island rule would result in the victim receiving $50,000 from the UM insurer and $50,000 from the insolvency fund. If the victim recovered any more, then the UM insurer would be entitled to reimbursement, so the insolvency fund's liability is offset by $25,000. This result can be reached without reference to the exhaustion provision. See Ferrari v. Toto, 402 N.E.2d 107,108-10 (Mass. 1980).
[23] Both provisions note that a covered claim shall not include amounts due to an insurance entity "provided, that a claim . . . asserted against a person insured under a policy issued by an insurer which has become an insolvent insurer . . . may be filed directly with the receiver of the insolvent insurer, but in no event may any [of the] claim be asserted against theinsured of the insurer." G.L. 1956 § 37-34-8(ii)(C); Mass. Gen. Laws c. 175D, § 1(2) (emphasis added).
[24] See discussion supra.
[25] Though the record is unclear as to the nature and existence of this agreement for each of the three cases at bar, for purposes of this decision, the Court will assume that it constitutes an assignment to Claimant of UMCo's subrogation claim against Tortfeasor.
[26] Plaintiff has asserted that in C.A. No. 02-4764, Martins should not be able to recover against Weremay except to the extent that Martins' damages exceed the $100,000 that Martins recovered from her UM policy. However, the relevant amount is not the Claimant's UM recovery, but Tortfeasor's liability policy. Weremay's liability policy only protected him at most to the extent of $25,000, so the Court sees no reason that he should be protected beyond that amount, because he would not have been so protected had Trust remained solvent. Therefore, to the extent that Martin's UM recovery has compensated her in place of Weremay's liability policy, Weremay is not subject to any subrogation claim for that amount. However, as to the remaining amount, which is at least $75,000, Weremay remains subject to any subrogation claim that Martins or Allstate may have against him. This distinction is not relevant for the other two cases since the liability policy limits were greater than or equal to the UM recoveries.
[27] As noted above, the record is unclear as to the extent of Weremay's liability coverage.